**Valin Thomas KLOCK, Appellant,**

v.

**The STATE of Texas, Appellee.**

**Nos. 01–02–00265–CR, 01–04–00506–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Jan. 13, 2005.

Discretionary Review Refused
Oct. 5, 2005.

Brian W. Wice, Houston, TX, Kyle A. Davis, Bryan, TX, for appellant.

Bill R. Turner, District Attorney, Douglas Howell, III, Assistant District Attorney, Bryan, TX, for appellee.

Panel consists of Justices TAFT, JENNINGS, and HANKS.

## OPINION ON MOTION
## FOR REHEARING

GEORGE C. HANKS, JR., Justice.

We withdraw our Opinion of May 13, 2004 and issue the following Opinion in its stead. We deny appellant's motion for rehearing.

Appellant, Valin Thomas Klock, and his co-defendants,[1] Eric Vaughn Schultze and Scott Alan Zunker, were indicted for the first-degree felony of aggravated sexual assault.[2] The jury assessed punishments of 22 years in prison for appellant, 30 years for Schultze, and 15 years for Zunker. The jury also found appellant guilty of sexual assault[3] and sentenced him to a concurrent term of 10 years in prison on the second count.

In seven points of error, appellant contends that the trial court erred in (1) denying appellant's request for a severance; (2) admitting a videotape of the death of appellant's roommate, John Hickman, at the punishment stage of trial; (3) excluding evidence concerning prison conditions; (4) denying his request to instruct the jury, at the punishment stage, about the elements of an extraneous offenses; (5) denying appellant's motion for mistrial; and (6) overruling appellant's objection during the State's final argument during punishment. We affirm.

## Factual and Procedural Background

On November 19, 2000, College Station Police Department Detective Chad Harkrider was called to investigate the alcohol-related death of John Hickman at 3311 Bahia in College Station. When he arrived at the scene and discovered that there were numerous people to interview, Harkrider contacted College Station Police Department Sergeant Chuck Fleeger for assistance. Appellant and Schultze were two of the people interviewed in connection with Hickman's death. During the course of the investigation, Detective Harkrider received an anonymous tip that there was a videotape of Hickman made on the night that he died.

---

1. Appellant's co-defendants also appealed their convictions. The Opinions for *Schultze v. State,* 01–02–00210–CR, 177 S.W.3d 26, 2005 WL 90731, and *Zunker v. State,* 01–02–00529–CR, 177 S.W.3d 72, 2005 WL 90932, were issued simultaneously with appellant's Opinion.

2. *See* TEX. PEN.CODE ANN. § 22.021(a)(2)(A)(v) (Vernon Supp.2004–2005) (acts in concert with another toward same victim).

3. *See* TEX. PEN.CODE ANN. § 22.011 (Vernon Supp.2004–2005)

On March 27, 2001, Jana French, a friend of appellant, provided the College Station Police Department with a videotape that she had obtained from appellant. Fleeger watched the videotape and discovered that, in addition to depicting Hickman the night that he died, 18 minutes and 45 seconds of the tape showed three men sexually assaulting an unconscious female. Fleeger recognized appellant and Schultze as two of the three assailants because he had recently interviewed them in connection with Hickman's death. He later determined the identities of the complainant[4] and the third assailant, Zunker.

The sexual assault[5] began with Zunker and Schultze entering a room where appellant was having sexual intercourse with the complainant, who appeared to be unconscious and physically unable to resist. Schultze, while manning the video camera said, "in her fucking cunt," and Zunker attempted to insert a baseball in the complainant's vagina. Zunker manned the video camera while Schultze inserted the handle of a toilet plunger in the complainant's vagina. Schultze told Zunker, "Make sure you get this on tape." When the plunger handle was inserted in the complainant's vagina, she moaned and said, "Ow. Stop," and continued to struggle. The three men laughed throughout the entire sexual assault. At one point, Zunker lit a cigarette and burned the complainant's vagina with the lit cigarette. Zunker then, mockingly, said, "Ow. That's got to hurt," and he proceeded to flick ashes onto the complainant's buttocks. Zunker and appellant also inserted a screwdriver and other objects into the complainant's vagina. The men continued to laugh as they performed these various acts on the unconscious complainant, with Schultze declaring, "this is fucking hilarious" at one point during the assaults.

Police Officers arrested appellant, Schultze, and Zunker the day after Sergeant Fleeger received the videotape. Also on that day, police officers searched the house at 3311 Bahia and found a video camera and a camera bag that contained another videotape. This second videotape showed Schultze urinating on an unconscious Hickman.

During his investigation, Fleeger determined that the sexual assault occurred in July 2000, seven or eight months before the videotape was discovered.

## Severance

■ In point of error one, appellant contends that the trial court, in violation of article 36.09, erred in denying appellant's severance during the punishment stage of trial. Appellant filed a pre-trial motion seeking severance, and he renewed his request for severance at punishment.[6]

■ Severance is not a matter of right, but rests within the sound discretion of the trial court. *Peterson v. State*, 961 S.W.2d 308, 310 (Tex.App.-Houston [1st

4. Before the police showed her the videotape, the complainant did not know that she had been assaulted. She testified that she worked with appellant at a pub, and she and some of her girlfriends were at a bowling alley when appellant and his friends arrived. Both groups went to another pub and then on to a bar that Schultze managed. There was excessive drinking, and the complainant did not remember any of the events occurring between the bar and waking up next to appellant in the Bahia house the next morning.

5. The description of the sexual assault is based on our review of the videotape as well as Sergeant Jeff Capps's testimony from the guilt stage of trial.

6. On appeal, appellant argues only that he was entitled to severance at punishment. He does not contest the trial court's denial of severance at the guilt stage.

Dist.] 1997, pet. ref'd). To show an abuse of discretion, an appellant bears the heavy burden of showing clear prejudice. *Id.*

A trial court must order a severance upon a timely motion and upon introduction of evidence that establishes either (1) that there is a previous admissible conviction against one defendant or (2) that a joint trial would be prejudicial to any defendant. TEX.CODE CRIM. PROC. ANN. art. 36.09 (Vernon 1981); *Aguilar v. State*, 26 S.W.3d 901, 903 (Tex.Crim.App.2000). Specifically, article 36.09 provides that:

> Two or more defendants who are jointly or separately indicted or complained against for the same offense or any offense growing out of the same transaction may be, in the discretion of the court, tried jointly or separately as to one or more defendants; provided that in any event either defendant may testify for the other or on behalf of the state; and provided further, that in cases in which, upon timely motion to sever, and evidence introduced thereon, it is made known to the court that there is a previous admissible conviction against one defendant or that a joint trial would be prejudicial to any defendant, the court shall order a severance as to the defendant whose joint trial would prejudice the other defendant or defendants.

TEX.CODE CRIM. PROC. ANN. art. 36.09.

■■■ Generally, when two defendants are jointly indicted for the same offense, they should be tried jointly. *Dickerson v. State*, 87 S.W.3d 632, 639 (Tex.App.-San Antonio 2002, no pet.). However, the trial court may order separate trials, at its discretion. TEX.CODE CRIM. PROC. ANN. art. 36.09. If a joint trial would prejudice either defendant, upon proper motion to sever, the trial court must sever the trial of the defendant whose joint trial could prejudice the other. *Id.*

■■■ The mere allegation that prejudice will result is not evidence of, or a sufficient showing of prejudice, as required under article 36.09, particularly when the severance is discretionary with the trial judge. *Mulder v. State*, 707 S.W.2d 908, 915 (Tex.Crim.App.1986). If no evidence is offered in support of the motion to sever, a trial court does not err in overruling the motion. *See Sanne v. State*, 609 S.W.2d 762, 776 (Tex.Crim.App.1980).

Appellant asserts that the mandatory provision of article 36.09, requiring a severance if one defendant has a prior conviction, exists to protect a co-defendant without a prior conviction from having a jury consider his guilt or innocence without regard to a co-defendant's prior conviction. Appellant argues, with no legal support, that "this same protection should exist with equal force to a defendant who wants jurors to consider his *punishment* without regard to a co-defendant's *prior unadjudicated felony arrests.*"

Appellant argues that he was prejudiced because he was forced to "sit next to Eric Schultze as jurors heard a litany of unadjudicated extraneous offenses offered against Schultze day after day." The jury saw a videotape Schultze made of Hickman shortly before he died of an overdose of alcohol and hydrocodone/Vicodin. The videotape showed that, while Hickman lay unconscious on a couch in the living room of the Bahia house, Schultze and several other men, laughed at him, poured water on his head, and shaved his pubic hair with an electric razor. Another videotape that was recovered, pursuant to a search warrant, depicted Schultze urinating on Hickman while Hickman lay unconscious in bed. The two Hickman recordings were not filmed on the same night.

Appellant acknowledges that the trial court repeatedly instructed the jury not to consider the Hickman videotapes and

Schultze's various unadjudicated offenses as evidence against appellant. In response to the repeated instructions to disregard, appellant asserts, as stated by the Dallas Court of Appeals, "There ought to be a limit to the number of times a skunk can be thrown into the jury box with instructions not to smell it." *Young v. State,* 752 S.W.2d 137, 145 (Tex.App.-Dallas, 1988 pet. ref'd).

Appellant concedes, however, that he is not an "angel," but he contends that his criminal history "paled in comparison to Schultze's." With respect to Schultze, the State presented the Hickman videotapes, in addition to evidence that Schultze had previously harassed his neighbors, damaged a neighbor's yard, had stolen a painting from the wall of a restaurant, had a pending felony aggravated assault charge stemming from a fight with his ex-girlfriend's boyfriend, and had been arrested for evading arrest after leading police on a 100 miles-per-hour chase. However, appellant's criminal history consists of convictions for (1) driving while intoxicated—DWI, (2) DWI-second, (3) assault-bodily injury, (4) possession of marihuana, (5) possession of controlled substance, (6) possession of drug paraphernalia, (7) driving while license suspended, (8) reckless damage or destruction of property, (9) disorderly conduct—noise, and (10) and (11) two failures to appear.

During its opening statement at punishment, the State informed the jury that the Hickman videos were "offered to show you something about Eric Schultze." Sergeant Fleeger testified that neither appellant nor Zunker was present on the Hickman videos. The record is replete with instructions from the trial court informing the jury not to consider the evidence presented against the other defendants when deciding appellant's punishment. Where the jury sentenced Schultze to 30 years in prison, appellant to 22 years in prison, and Zunker to 15 years, there is no indication that the jury was unable to follow the trial court's instructions.

Assuming that article 36.09 applies to the punishment stage of trial, we hold that appellant failed to meet his heavy burden of showing that the trial court abused its discretion when it found that appellant did not show clear prejudice would result from a joint trial. *See Peterson,* 961 S.W.2d at 310.

We overrule point of error one.

### Erroneously Admitted/Excluded Evidence

In points of error two and three, appellant contends that the trial court erred in admitting a videotape of John Hickman's death over appellant's objection that it was inadmissible pursuant to Texas Rules of Evidence 401 and 403. In point of error four, appellant contends that the trial court erred in excluding evidence of prison conditions.

### Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Green v. State,* 934 S.W.2d 92, 101–02 (Tex.Crim.App.1996). Where the trial court's evidentiary ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and the reviewing court must uphold the trial court's ruling. *Id.* All relevant evidence is admissible, except as otherwise provided by Constitution, by statute, by the rules of evidence, or by other rules prescribed pursuant to statutory authority. TEX.R. EVID. 402. Evidence is relevant if it tends to make the existence of any consequential fact more or less probable than it is without the evidence. TEX.R. EVID. 401. After the defendant has been found guilty, evidence may be offered by the State and the defendant "as to any matter the court deems relevant

to sentencing." TEX.CODE CRIM. PROC. ANN. art. 37.07 § 3(a)(1) (Vernon Supp.2004–2005).

The erroneous admission or exclusion of evidence does not result in reversible error unless it affects a substantial right of the accused. *See* TEX.R.APP. P. 44.2(b); *Alexander v. State*, 137 S.W.3d 127, 130 (Tex. App.-Houston [1st Dist.] 2004, pet. ref'd). Substantial rights are affected when the error has a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App.1997).

**John Hickman's Death**

■ As noted above, Schultze videotaped Hickman shortly before he died of an overdose of alcohol and hydrocodone/Vicodin. The videotape shows that, while Hickman lay unconscious on a couch in the living room of the Bahia house, Schultze and several other men laughed at him, poured water on his head, and shaved his pubic hair with an electric razor. Another videotape that was recovered, pursuant to a search warrant, depicted Schultze urinating on Hickman while Hickman lay unconscious in bed. The two Hickman recordings were not filmed on the same night.

Before the opening statements in the punishment stage, the trial court instructed the jurors that, "In assessing the evidence you hear in this phase of the trial, you may consider any act or acts solely against that party or parties who engaged in the act or acts. You may not consider any such act or acts against any Defendant who was not engaged in that act or acts."

Appellant directs us to the State's opening statement where the jurors were told

We're going to show you a segment, again, from that first videotape. You heard about the death of John Hickman. That death occurred at 3311 Bahia on the couch. It was tape-recorded. It was on that videotape. We're going to show that videotape this afternoon. And it will not be pleasant. John Hickman lies dying on the couch from a drug and alcohol overdose. Manning the camera was Eric Schultze. The man lying on that couch dying clearly needed medical attention. I'll just let you watch that videotape, and you'll see.

I'll show you another videotape likely tomorrow morning. Further conduct on the part of Eric Schultze. Those two tapes are offered to show you something about *Eric Schultze*.

(Emphasis added.) Appellant's attorney objected that the videotape was not relevant to appellant's case. Schultze's attorney objected that the videotape was prejudicial because there were some unidentified individuals on the tape that were making offensive statements off camera, and Zunker's attorney sought a severance because he was concerned that the tape would prejudice Zunker despite the trial court's instruction. All of the objections and requests were overruled. In closing argument of the punishment phase, the State asked the jury, "For Eric Schultze you can watch that video of the night that John Hickman died and ask yourself: Does he deserve even more? John Hickman could have been saved that night."

Based on the state of the record, appellant argues that the trial court abused its discretion in overruling appellant's relevance objection because appellant was not on the Hickman videotapes and had nothing to do with the events shown on them. Appellant further argues that, if the videotapes were relevant, their probative value was outweighed by their prejudicial effect.

As appellant acknowledges, the trial court repeatedly instructed the jury to disregard any act or acts introduced against

another defendant when determining its punishment for appellant. This instruction, in essence, notified the jury that the Hickman videotapes could only be used to evaluate punishment for Schultze. The individualized sentences—22 years for appellant, 15 years for Zunker, and 30 years for Schultze—indicate that the jury followed the trial court's instructions. Appellant has presented nothing to show that the jury considered the Hickman videos against him.

We overrule points of error two and three.

## Leroy Hall's Testimony

■ During the punishment stage, Zunker's attorney called Reginald Jenkins as a witness. Jenkins is a detention officer with the Brazos County Sheriff's Department, and he was previously employed as a prison guard at a maximum security prison. Jenkins testified that Zunker had been a "model inmate" during his more than 300 days of detention at the time of trial. Jenkins explained what a normal day is like for Zunker while in detention, and that, due to his conviction for aggravated assault, he cannot be a prison trustee.

Appellant's attorney questioned Jenkins about the conditions in maximum security prisons. Jenkins testified that it was "very possible" that the defendants would be going to a maximum security prison, which holds murderers, major drug dealers, embezzlers, and forgers. He further testified that there is "rampant gang affiliation" in prison.

On cross-examination, the State elicited more testimony regarding the conditions in prison. Jenkins testified that rigid laws regulate prisons to make sure they are safe. Prison units have job fairs and classes allowing the inmates to get degrees ranging from G.E.D.s to Ph.D.s, and law libraries that are second-to-none. Prison units also have exercise weights, baseball diamonds, basketball courts, and horseshoes. Each prison unit also has a minimum of two televisions in each dayroom, and the inmates are allowed to see the National Basketball Association finals and the Super Bowl on television. On re-direct examination, Schultze's attorney asked Jenkins if he felt it would be helpful to hear from someone who "was actually on the inside looking out." Jenkins responded, "possibly."

Later, Zunker's attorney called Leroy Hall to testify about the time that he served in the Texas Department of Corrections from 1990–1997. The State objected that the testimony from Hall concerning prison conditions was irrelevant. Zunker's attorney responded that the State had "opened the door to the country club atmosphere," and the trial court originally agreed. When the State added that the witness was an expert, who had not been properly designated as such, the trial court overruled that objection as well.

After Zunker's attorney asked Hall a few more questions, the trial court began sustaining the State's relevance and invading-the-province-of-the-jury objections. The trial court then discussed its rulings outside the presence of the jury and reconsidered and sustained the State's relevance objection. The defendants' attorneys made a bill of exception, and, at the conclusion of the bill, the trial court clarified that Hall's testimony was inadmissible, and the court instructed the jury to disregard it. The trial court stated that it based its decision on

> 401, the relevance. I'm also basing my decision on the fact that I did not believe the door was opened by the State. Number three, I'm making my decision on the fact that ... I still think 701 and 702 may apply and there should have

been a notice given that this person was an expert witness.

On appeal, appellant contends that Hall's evidence was (1) a matter of optional completeness, (2) relevant to rebut Jenkins's false impression, and (3) lay person testimony, not expert testimony.

The Court of Criminal Appeals has explained that, under article 37.07 section 3(a), the admissibility of evidence at the punishment phase of a non-capital felony trial is a function of policy rather than relevancy. *See Mendiola v. State*, 21 S.W.3d 282, 285 (Tex.Crim.App.2000); *Miller–El v. State*, 782 S.W.2d 892, 895 (Tex.Crim.App.1990). This is so because, by and large, there are no discrete factual issues at the punishment stage. *Miller–El*, 782 S.W.2d at 895–96. Thus, determining what is "relevant" in regard to punishment, under article 37.07 section 3(a), "should be a question of what is helpful to the jury in determining the appropriate sentence in a particular case." *Mendiola*, 21 S.W.3d at 285. In *Schielack v. State*, 992 S.W.2d 639 (Tex.App.-Houston [14th Dist.] 1999, pet. ref'd), when faced with the attempt to introduce similar evidence to that which was attempted to be introduced here, the Fourteenth Court of Appeals held as follows:

> In the present case, the testimony which [Schielack] sought to introduce was neither [evidence of the circumstances of the offense itself or the defendant himself]. In fact, the testimony consisted of another person's experiences in prison. There is no evidence that [Schielack's] experience would be the same. As such, we believe that the trial court's decision to exclude this testimony was at least within the zone of reasonable disagreement; therefore, the trial court did not abuse its discretion.

*Id.* at 642–43.

Appellant argues that *Schielack* is not instructive because it pre-dates two Court of Criminal Appeals cases that addressed relevancy—*Mendiola* and *Sunbury v. State*, 88 S.W.3d 229 (Tex.Crim.App.2002). Furthermore, appellant states that *Schielack* was distinguished by the Waco Court of Appeals in *Najar v. State*, 74 S.W.3d 82 (Tex.App.-Waco 2002, no pet.).

In *Najar*, Warden Botkin did not give testimony in the form of an opinion, lay or expert. *See id.* at 86 (*citing* TEX.R. EVID. 701, 702). She was never asked to express an opinion. *Id.* Thus, she was a fact witness whose testimony was challenged solely on the basis of its relevancy. *Id. Najar* stated that *Schielack*:

> is distinguishable from the present case because Botkin testified that inmates similarly-situated to Najar— same offense, no history of violence or aggression, no behavioral problems while incarcerated—would be placed into "minimum custody" and be immediately eligible for all appropriate prison programs; prison overcrowding is not an obstacle to expeditious placement into programs. Therefore, the warden's testimony was not merely speculative as to Najar. Furthermore, *Schielack* did not hold that evidence about prison conditions is *per se* irrelevant; *Schielack* stands only for the principle that its relevancy depends on the facts and circumstances of the case.

*Id.* at 87. We agree with *Najar's* characterization of the holding in *Schielack*. We do not, however, agree that *Najar* is more on point to this case.

During the defendants' bill of exception, Hall testified, at length, about the consequences of being "fresh meat" in prison. After the recitation, Zunker's attorney and Schultze's attorney asked Hall to comment about whether each of the defendants

would be treated as "fresh meat." Zunker's counsel asked Zunker to stand and then asked Hall, "What about a white male that's never been to prison before that's his size and weight. Is he going to be considered fresh meat or not?" Schultze's attorney then asked Schultze to stand, and he asked Hall, "Are the things that you said pertaining to Mr. Zunker . . ., would that go for Mr. Schultze as well?" Hall responded, "Yes. It will go for anybody that goes into the system that's never been there before." Hall's testimony was describing prison life as he had observed it several years before, rather than present prison life that was described by the warden in *Najar*.

The trial court could have reasonably concluded that Hall's testimony would not have been helpful to the jury in determining the appropriate sentence in this case. Also, the trial court could have reasonably concluded that Hall's testimony went beyond the scope of any door opened by the State. Under the precedent of *Mendiola,* the trial court's decision to exclude the testimony of Hall was at least within the zone of reasonable disagreement.

Accordingly, we hold that the trial court did not err in excluding Hall's testimony. Having held that the trial court did not err in excluding Hall's testimony, we need not determine whether Hall was a properly designated expert.

We overrule point of error four.

### Jury Instruction

■ In point of error five, appellant argues that the trial court erred in denying appellant's requested jury instruction setting out each of the elements of all of the unadjudicated offenses introduced by

the State in the punishment stage of trial.[7] The State introduced evidence that appellant had previously committed the following offenses: DWI, DWI-second, assault-bodily injury, possession of marihuana, possession of controlled substances, possession of drug paraphernalia, driving while license suspended, reckless damage or destruction of property, disorderly conduct—noise, and two failures to appear.

■ When a complaint is raised on appeal regarding error in the trial court's charge to the jury, a reviewing court must determine whether the charge was erroneous, and, if so, whether the error was harmful to the defendant. *See Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App. 1984). The State may offer evidence of extraneous offenses during the punishment phase of the trial. Tex.Code Crim. Proc. Ann. art. 37.07 § 3(a)(1) (Vernon Supp. 2004–2005). The trial court, as it did here, must charge the jury that it can only consider such evidence if it finds beyond a reasonable doubt that the defendant committed the offenses. *See Huizar v. State,* 12 S.W.3d 479, 483–84 (Tex.Crim.App. 2000). There is, however, no requirement in our law that all of the statutory elements of an offense must be proven before a prior unadjudicated extraneous offense may be admitted at the punishment phase of trial. *Spence v. State,* 795 S.W.2d 743, 759 (Tex.Crim.App.1990). Because *Spence* does not require the State to prove all the elements in an extraneous offense in the punishment stage, it is unnecessary for the trial court to submit an instruction that includes the elements of such extraneous offenses.

We overrule point of error five.

7. Appellant cites no authority for his argument that the elements of extraneous offenses must be submitted to the jury.

## Jury Argument

In point of error six, appellant contends that the trial court erred in denying his motion for mistrial after the State argued in its final argument in the punishment stage of trial that appellant watched his best friend die. In point of error seven, appellant contends that the trial court erred in overruling appellant's objection after the State argued matters outside the record during its final argument in the punishment stage of trial.

The law provides for, and presumes, a fair trial, free from improper argument by the State. *Long v. State*, 823 S.W.2d 259, 267 (Tex.Crim.App.1991). Proper jury argument generally must encompass one of the following general areas: (1) a summation of the evidence presented at trial; (2) a reasonable deduction drawn from that evidence; (3) an answer to the opposing counsels argument; or (4) a plea for law enforcement. *Guidry v. State*, 9 S.W.3d 133, 154 (Tex.Crim.App. 1999); *Sandoval v. State*, 52 S.W.3d 851, 857 (Tex.App.-Houston [1st Dist.] 2001, pet. ref'd). To determine whether a party's argument properly falls within one of these categories, we must consider the argument in light of the entire record. *Sandoval*, 52 S.W.3d at 857. In most cases, if error occurs, an instruction to disregard will cure any error committed. *Shannon v. State*, 942 S.W.2d 591, 597 (Tex.Crim. App.1996).

### Motion for Mistrial

During closing argument at the punishment stage, the State stated that "These three Defendants need to be held accountable for the total and continued disregard for life and for the law. They had chances. They've been in trouble before. They watched their best friend die of a drug and alcohol overdose." The trial court sustained appellant's objection and instructed the jury to disregard the last statement, but denied the motion for mistrial.

At almost every mention of the Hickman videotapes, the trial court instructed the jury that the evidence introduced against one party cannot be considered against any other party. The jury saw the Hickman videotapes and heard testimony describing who was present during the filming of the videotapes.

We presume the instruction was sufficient to cure any harm. *See Gardner v. State*, 730 S.W.2d 675, 696 (Tex.Crim.App. 1987); *Pineda v. State*, 2 S.W.3d 1, 11 (Tex.App.-Houston [1st Dist.] 1999, pet. ref'd).

We overrule point of error six.

### Outside Record

In point of error seven, appellant asserts that the trial court erred in overruling appellant's objection after the State argued matters outside the record during its final argument in the punishment stage of trial.

During closing argument at the punishment stage, the State argued:

> Imagine the embarrassment, the humiliation that [the complainant] has had to go through. Every time you think about the excuses the Defendants offered, think about [her], what she's going through, what her parents are going through, what her dad is thinking knowing that his little girl was violated in the worst way.

The trial court overruled appellant's objection that the prosecutor's argument was outside the record. Appellant argues that this statement was a direct violation of the trial court's ruling on a motion in limine "that the State's attorney not mention or state to the jury the probable testimony of

any witness who is absent or unavailable and was not called to testify in this cause."

■■■ The complainant's parents did not testify; therefore, the argument was outside the record, and the trial court erred in overruling appellant's objection. The error was nonconstitutional; thus, the standard of review is that in Texas Rule of Appellate Procedure 44.2(b). Rule 44.2(b) provides that a nonconstitutional error "that does not affect substantial rights must be disregarded." TEX.R.APP. P. 44.2(b). Determining harm under that standard in improper argument cases requires balancing the following three factors: (1) severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of conviction/punishment absent the misconduct. *Id.; Mosley v. State,* 983 S.W.2d 249, 259 (Tex.Crim.App.1998).

**Severity of the Misconduct**

In *Martinez v. State,* 17 S.W.3d 677 (Tex.Crim.App.2000), the Court of Criminal Appeals was faced with a similar issue when it was asked to reverse a death penalty conviction in light of the following jury argument at the conclusion of the punishment stage of trial:

PROSECUTOR: And based on this evidence, this—this rates as one of the worst crimes, one of the worst killings not only in Brazoria County but the State of Texas.

DEFENSE COUNSEL: Objection, your honor. That's not in the record.

THE COURT: Stay in the record, counsel.

PROSECUTOR: The evidence shows you, these were execution killings. 26 to 28 bullets. The family of the murdered victims, the family—the victims themselves, they cry out to you, for the death penalty in this case. There's no more—

DEFENSE COUNSEL: Objection, your Honor. Not in the record, either. Absolutely no evidence of that.

THE COURT: Overruled.

PROSECUTOR: Justice in this case requires you, because we told you from day-one, what we wanted was a fair jury, a jury that would do justice in this case.

*Martinez,* 17 S.W.3d at 692. The court concluded that

the degree of misconduct, if any, was relatively mild in the present case. The prosecutor's comment that the victims and their families cry out for the death penalty appears to be intended as a plea for law enforcement. The jury was in a position to know that victims who are dead cannot presently cry out for the death penalty, and that, given the facts surrounding their deaths, no such cries were made before they died. *Nor would the jurors be surprised to hear that the victims' families would be upset with appellant or that they would want retribution.* And the prosecutor did not attempt, through this argument, to convey any specific facts about the effect of the victims' deaths upon their families. Instead, the prosecutor was pleading with the jury to give the death penalty because the record before the jury showed that the defendant deserved it. To the extent that the prosecutor conveyed facts outside the record, such facts had no tendency to adversely influence the jury against appellant beyond the influence exerted by a wholly legitimate plea for law enforcement.

*Id.* at 693 (emphasis added). Here, like in *Martinez,* the prosecutor's comments did not attempt to convey *specific* facts about the effect of the complainant's assault upon her family so much as it was conveying matters the jury would not be surprised to hear because they are obvious or common

knowledge. Accordingly, we conclude that the degree of misconduct was minimal.

**Curative Measures**

The trial court did not make any attempt to cure the misconduct.

**Certainty of Punishment Absent the Misconduct**

Appellant was found guilty of the first-degree felony offense of aggravated sexual assault—an offense punishable by imprisonment for life or for a term of not more than 99 years or less than 5 years.[8] *See* TEX. PEN.CODE ANN. § 12.32 (Vernon 2003). If a jury sentences an individual to less than 10 years, it may recommend to the trial court that the imposition of the sentence be suspended and that the defendant be placed on community supervision. TEX. CODE CRIM. PROC. ANN. art 42.12, § 4(a), (d)(1) (Vernon Supp.2004–2005). Here, the jury assessed punishment at 22 years in prison. To evaluate the "certainty of the punishment absent the misconduct," we must examine all the evidence presented during punishment.

**State's Witnesses**

The jury saw the videotape of Hickman taken shortly before his death. Sergeant Fleeger testified that neither Zunker nor appellant was present in the Hickman video. Fleeger authenticated a municipal court complaint filed against appellant on November 19, 2000 charging him with reckless damage or destruction stemming from an incident at the police station when appellant found out that Hickman had died. Appellant and Hickman were very good friends. Fleeger took appellant's statement at the police station at 8 a.m. the morning of Hickman's death, and Fleeger testified that appellant was very intoxicated. Fleeger and Detective Hark-

rider both testified that appellant, Schultze, and Zunker were not peaceful, law-abiding citizens, and that they have bad reputations in the community.

Austin Police Department Officer J.D. Floyd testified that, on April 21, 2001, while on duty, he saw appellant, who was driving the opposite direction, driving 70 miles per hour (mph) in a 55 mph zone. He turned around and followed appellant and saw him switch places with the passenger in the car. The "driver" said that he had switched places because his friend's driver's license had been suspended. Floyd spoke with appellant and discovered that appellant was concealing a marihuana cigarette in the waistband of his shorts. He arrested appellant for possession of marihuana and driving with a suspended license. Floyd testified that appellant's license was suspended because of an earlier DWI conviction.

Bryce Pflughaupt testified that, on December 9, 2000, Schultze approached him at a bar and said, "It's my birthday. Tonight I'm going to kick somebody's ass." Schultze approached him a second time and said, "I'll kill you, mother fucker." Pflughaupt testified that the manager of the bar asked appellant, Schultze, and a couple of other people who were with them, to leave. When Pflughaupt left the bar an hour and one half later, appellant and his friends were waiting for him. Schultze hit him and knocked him to the ground. Appellant kicked him and prevented him from getting up. The jury was shown photographs of Pflughaupt taken at the emergency room after the fight. Pflughaupt described his injuries to the jury. He said that his "nose was pretty puffy.... [His] eyes swollen shut. [His]

---

**8.** Appellant was also found guilty of sexual assault for which he was sentenced to a concurrent term of 10 years in prison. This point of error pertains to the punishment for the aggravated sexual assault.

lip down on my teeth from that cut. Bruised. Pretty banged up pretty bad." He testified that his wrist was broken, and it required surgery and rehabilitation as a result of the fight initiated by Schultze.

Stephen Rogers testified that he was walking behind Pflughaupt on December 9, 2000 when a group of guys circled Pflughaupt and "basically just beat the crap out of him." The circle of guys would not let anyone in to break up the fight. He did not see who the people were who were fighting Pflughaupt.

Bryan Police Department Officer Gabriel Alvarez testified that, at 1:10 a.m. on January 13, 2001, he stopped appellant for spinning his wheels, accelerating, and "roaring" his engine. Officer Alvarez testified that spinning your tires and exhibition of acceleration is a violation. Alvarez spoke with appellant, who was driving the car, and suspected that appellant was DWI. After performing a series of sobriety tests, Alvarez arrested appellant for DWI.

The State also introduced municipal court complaints from Brazos County for October 20, 2000—disorderly conduct-noise-residence; January 9, 2001—failure to appear for disorderly conduct complaint; May 9, 2001—failure to appear for October disorderly conduct complaint; and May 9, 2001—failure to appear for January failure to appear complaint.

**Defense Witnesses**

Zachary Kent, who is "very good friends" with Schultze, testified that Pflughaupt was the aggressor in the fight with Schultze. He confirmed that appellant and his friends were thrown out of the bar the night of the fight. Kent testified that he saw appellant try to stop Pflughaupt from fighting more. Kent left the scene of the fight because the manager said that "the cops were coming."

Marilyn Mills, appellant's aunt, testified that, while he was a child, appellant lived with her for seven years. She testified that appellant was "not a priority" to his parents and was in and out of social services because of parental neglect. Mills testified that appellant was a "very loving person" who "has a need to be wanted." She saw the sexual assault video and her evaluation was that it appeared that appellant was being "egged on" in the video. Mills believed that appellant should get probation. On cross-examination, Mills acknowledged that appellant sexually assaulted an unconscious woman on the videotape and that being raised in a broken home is no excuse for such conduct. She admitted that, during the course of the trial, she had learned that, at the time of this sexual assault trial, appellant was on bond supervision for three offenses—aggravated sexual assault, sexual assault, and DWI. She also admitted that she had just learned that appellant had been arrested for possession of marihuana and driving with a suspended license. She testified that she did not know until trial that, as a condition of his bond on the DWI, appellant was required to keep a guardian enter-lock device in his car. She did not know that, in violation of his bond supervision, appellant had removed the device from his car.

Ashley Averitt testified that she and appellant had gone on several dates, and he was always "nothing but a good person" to her. She has been intoxicated around him, and he never acted inappropriately. She believed appellant should get probation. On cross-examination, Averitt admitted that she did not know that appellant violated his bond supervision when he went dancing with her at a bar. She did not know that he had tested positive for marihuana.

Jeanne Marie Birdwell testified that she dated appellant for one month while they were both students at Mary Hardin Baylor. She described him as very caring and having a "big heart." She testified that he was "a follower" and "never started anything." She said that appellant "knows that he made a mistake and that guilt alone is enough punishment." Birdwell watched the sexual assault videotape and admitted that she expected it to "be rougher and more forceful." On cross-examination, she agreed that, because the complainant was unconscious, there was little need for "force." She also conceded that the complainant reacted in pain; therefore, the assault must have been "pretty rough." Birdwell was unaware that, in April 1998, appellant was convicted for DWI. She was also unaware that, while he was on probation for that DWI, appellant violated his probation by drinking again as a minor in possession. Finally, she was also unaware of appellant's subsequent DWI conviction.

Jeff Shinn, appellant's college roommate, testified that appellant's father was "really tough on him," and he was a "follower" and "had a hard time saying 'no.'" He believed that appellant should get probation because he was "embarrassed" by what he had done. On cross-examination, Shinn admitted that, not in "a thousand lifetimes" would he do something like he saw appellant do on the videotape. Shinn testified that, had he been there, he "would have known it was wrong, but [he] would have been laughing, giggling, kind-of-type thing." No one asked Shinn any questions after that admission.

Connie Sympson, appellant's aunt, testified that appellant's mother was an alcoholic and his father used drugs and alcohol. Appellant, who was required to wear an ankle monitor, lived with Sympson while he was out on bond for this sexual assault. She testified that "he wants to be a productive person in society" and he should get probation because he is not a bad person. On cross-examination, Sympson discovered that appellant had violated his bond on numerous occasions while under her control. Sympson agreed with the prosecutor's statement, "facing a serious first degree felony, probably the most important event in his life, and he still couldn't conform his conduct to just a simple condition of bond. Is that a true statement?" She acknowledged that appellant did not take the initiative to seek help for his alcohol problems.

Larry Hill, appellant's high school football coach, testified that appellant was a "follower." He was not impressionable, but did have a desire to please. Hill agreed that being a follower is no excuse for criminal conduct.

James Ezelle, Jr., Schultze's psychiatric expert, agreed that, if a person grew up with both rejection and abandonment by his parents, he would have a strong need for the group and a compromised ability to stand up to the group.

Aslynn Min Jares, appellant's former girlfriend, testified that appellant "treated [her] with kid gloves almost at all times." Acceptance is "very, very important" to appellant, and it did not surprise her to hear that he did not stand up to his friends. She was, however, "very, very surprised" to hear about the sexual assault charges. Jares believed that appellant had the "least involvement" in the offense, but the case was "still very shocking."

**Rebuttal Witnesses**

On rebuttal, Betty Meier, appellant's probation officer, testified that she began supervising appellant in March 2001 for DWI. She supervised him again for this felony aggravated sexual assault and a pending assault charge. On her first office visit with him in March 2001, appellant lied to her. Knowing that a condition of his

bond was that he could not drive without the ignition enter-lock device, appellant told Meier that he was not driving. After he left her office, Meier watched appellant get into a car and drive it from her office. One month later, appellant was arrested for driving with a suspended license and marihuana possession. Appellant failed to report either arrest to Meier. Meier testified that appellant violated the conditions of his bond by (1) committing an offense and (2) not reporting the offense to her. Appellant's urine tested positive for marihuana, and he violated his curfew several times. He violated his bond conditions by going dancing at a bar and by smoking marihuana. Meier testified that appellant repeatedly lied to her. He lied when he told her that he was not driving. He lied when he told her that he was not involved in this sexual assault case. Appellant asked if he could move to California, and Meier said that she was originally considering granting him permission. Then, she learned about the marihuana and driving with license suspended arrests, and she reconsidered. When she told him that he could not move, appellant told her "My attorney told me to lie to you about this arrest; and that's the reason I didn't tell you about it." Finally, he removed the enter-lock system from his car without permission.[9] When asked if appellant should be considered for probation, Meier responded

> Based on the numerous violations that he had while on bond—he was on bond for a very serious offense and it doesn't appear to me that that had much effect on him because he continued to violate the law. He continued to violate the conditions of bond while on bond supervision.

So based on the fact that he was on bond supervision, continued to violate the law, based on the fact that he continued to lie to me on several occasions while on bond supervision, I don't feel that he can be trusted. I also have concerns about the safety of the community if he is released into the community.

Finally, Sergeant Fleeger testified again and stated that, "based on the heinousness of the crime" and his "knowledge ... [of] arrests of the Defendants before and after their arrests for this case," he did not believe the defendants deserved probation. He acknowledged that he had never recommended probation as a witness, but believed that sometimes it is appropriate.

Here, the jury heard testimony from nine of appellant's witnesses. They all testified that appellant came from a troubled home, but was a good guy and a follower. In addition, the jury saw videotape evidence of appellant engaging in truly barbaric behavior—the sexual assault of an unconscious young woman—by Schultze inserting a toilet plunger handle in her vagina and his suggesting that appellant and Zunker force a baseball in her vagina, while Schultze manned the video camera. The videotape also showed Zunker burning the complainant's vagina with a lit cigarette and appellant and Zunker inserting a screwdriver blade into the complainant's vagina. Appellant's misconduct was further emphasized by his laughter at the complainant during the assault, while Schultze declared that this was "fucking hilarious." They heard testimony from several policemen who testified that the defendants were not law-abiding citizens, and they heard from appellant's bond supervisor who outlined numerous ways in which appellant had violated the terms of

9. The enter-lock device was put on appellant's car after his DWI conviction. It prevented the car from starting until appellant blew into the device which registered if he had been drinking.

his bond while trial was pending in this first degree felony case.

Taking all of the evidence into consideration, and in light of our holding that the argument did not constitute severe misconduct, we hold with fair assurance that the trial court's error in overruling appellant's objection to the above argument did not influence the jury and did not affect his substantial rights.

We overrule point of error seven.

### Conclusion

We affirm the judgment.

Justice JENNINGS, dissenting.

TERRY JENNINGS, Justice, dissenting.

Because the appropriate standard for determining the harm of the State's improper punishment argument requires that this case be reversed and remanded for a new punishment hearing, I respectfully dissent.

In his seventh point of error, appellant contends that the trial court reversibly erred in allowing the State to make the following argument:

> [State]: Imagine the embarrassment, the humiliation that [the complainant] had to go through. *Every time you think about the excuses* the Defendants offered, *think about* [her], what she's gone through, *what her parents are going through, what her dad is thinking knowing that his little girl was violated in the worst way.*
>
> [Appellant]: Judge, I'll object. There is no evidence as to what her parents were thinking as to even their presence [sic] here in the courtroom.
>
> [Trial Court]: Overruled.

(Emphasis added.) As conceded by the State during oral argument in this Court,

there is, in fact, no evidence in the record that the complainant's parents were even living at the time of the offense or aware that the complainant had been sexually assaulted.

The law provides for, and presumes, a fair trial free from improper argument by the State. *Long v. State*, 823 S.W.2d 259, 267 (Tex.Crim.App.1991). It is well-settled that a prosecutor cannot use closing argument to place matters before the jury that are outside the record and prejudicial to the accused. *Everett v. State*, 707 S.W.2d 638, 641 (Tex.Crim.App.1986); *Thompson v. State*, 89 S.W.3d 843, 850 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). Arguments referencing matters that are not in evidence and may not be inferred from the evidence are usually "designed to arouse the passion and prejudices of the jury and as such are highly inappropriate." *Thompson*, 89 S.W.3d at 850 (quoting *Borjan v. State*, 787 S.W.2d 53, 57 (Tex.Crim.App.1990)).

Here, the State invited the jury, "*every time*" it considered the defendants' punishment arguments, to instead focus on what her parents were "going through" and, in particular, "*what her dad is thinking knowing* that his little girl was violated in the worst way." (Emphasis added.) It is readily apparent that the State, in an effort to completely nullify the defendants' punishment arguments, sought to inflame the "passions and prejudices of the jury," especially those members of the jury who were parents. This highly prejudicial argument was egregiously inappropriate, and the trial court gravely erred in overruling appellant's objection, an objection which so obviously should have been sustained.

Appellant concedes that the trial court's error in overruling his objection was nonconstitutional and that the appropriate harm standard of review provides that such an error "that does not affect substantial rights must be disregarded." TEX.

R.App. P. 44.2(b). In *Hawkins v. State*, the Court of Criminal Appeals has recently held that determining harm under this standard concerning improper punishment argument in non-capital cases requires balancing three factors: (1) the severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the *certainty* of the punishment assessed absent the misconduct (likelihood of the same punishment being assessed). 135 S.W.3d 72, 77 (Tex. Crim.App.2004).

In regard to the first factor, the State's argument, asking the jurors to substitute their thoughts "about ... what her parents are going through, what her dad is thinking knowing that his little girl was violated in the worst way" in place of appellant's punishment arguments, when there is absolutely no evidence whatsoever that the complainant's parents were even aware of the sexual assault, was a flagrant attempt to arouse the passion and prejudices of the jury. The degree of such misconduct is not "minimal," and, as noted above, such an argument, "designed to arouse the passion and prejudices of the jury," is "highly inappropriate." *Thompson*, 89 S.W.3d at 850 (quoting *Borjan*, 787 S.W.2d at 57).

The trial court, in regard to the second factor, made no attempt at all to correct the State's misconduct. The bottom line is that it simply failed to sustain appellant's proper objection to an obviously improper argument. Moreover, the trial court's failure to sustain appellant's objection to the argument borders on constitutional error. *See Thompson*, 89 S.W.3d 843, 852 (noting that State's argument "by urging the jury to consider matters not before them, and while effectively acknowledging that to do so was a violation of their solemn oath as jurors ... violated the Due Process Clause of the Fourteenth Amendment and implicated the Confrontation Clause of the Sixth Amendment.").

Finally, in regard to the third factor, appellant faced the widest possible range of punishment provided for an offense in the Texas Penal Code: confinement in prison "for life or for any term of not more than 99 years or less than 5 years." Tex. Pen.Code Ann. § 12.32 (Vernon 2003). If the jury had sentenced appellant to confinement for 10 years or less, it could have recommended to the judge that the imposition of appellant's sentence be suspended and that appellant be placed on community supervision. Tex.Code Crim. Proc. Ann. art. 42.12 §§ 4(a), (d)(1) (Vernon Supp. 2004–2005).

Given the wide range of possible punishment, the *certainty* of appellant's sentence, confinement for 22 years, absent the State's misconduct cannot be considered separate and apart from the severity of the State's misconduct. As noted in the majority opinion, appellant presented numerous character witnesses who testified on his behalf in the punishment phase of trial. Although, as noted in the majority opinion, the credibility of their character testimony may have been brought into question under cross-examination, an intermediate court of appeals is not a fact-finder. More importantly, the simple fact remains that the State, regardless of the actual evidence before the jury for its consideration in assessing punishment, invited the jury, *"every time"* it considered appellant's punishment arguments to simply focus on what the complainant's parents were "going through," and, in particular, "what her dad is thinking knowing that his little girl was violated in the worst way"—matters which were not in evidence. This was not a mere "plea for law enforcement" as discussed in *Martinez v. State*, 17 S.W.3d 677, 693 (Tex.Crim.App.2000). In effect, the State argued that the jury should ignore the evidence and focus on the specific facts about the effect the offense had on the

complainant's parents. Given the severity of this misconduct and its highly prejudicial nature, it cannot be said with certainty that the jury, absent the misconduct, would likely have assessed the "same punishment" of confinement for 22 years.

The facts of this case are truly ugly, but the severity of the offense did not relieve the trial court of its solemn obligation to "preserve, protect, and defend the Constitution and laws of the United States and of this State." In fulfilling this duty, we, as judges, should remember the words of Justice Felix Frankfurter: "A timid judge, like a biased judge, is intrinsically a lawless judge." *Wilkerson v. McCarthy*, 336 U.S. 53, 65, 69 S.Ct. 413, 419, 93 L.Ed. 497 (1949) (Frankfurter, J. concurring). I cannot conclude with "fair assurance," as is required by the rule of law, that the trial court's error in overruling appellant's proper objection to the State's highly inappropriate argument "did not influence the jury, or had but a slight effect." *See Reese v. State*, 33 S.W.3d 238, 243 (Tex. Crim.App.2000). Accordingly, I would grant appellant's motion for rehearing, sustain his seventh point of error, and reverse and remand the case for a new punishment hearing.