**Scott Alan ZUNKER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–02–00529–CR.**

Court of Appeals of Texas, Houston (1st Dist.).

Jan. 13, 2005.

Discretionary Review Refused Oct. 5, 2005.

Craig M. Greaves and Travis B. Bryan, III, Bryan, Stacy & Dillard, L.L.P., William F. Carter, Bryan, TX, for Appellant.

Bill R. Turner, District Attorney, Douglas Howell, III, Assistant District Attorney, Bryan, TX, for Appellee.

Panel consists of Justices TAFT, JENNINGS, and HANKS.

## OPINION ON MOTION FOR REHEARING

GEORGE C. HANKS, JR. Justice.

We withdraw our Opinion of May 13, 2004 and issue the following Opinion in its stead. We deny appellant's motion for rehearing. Appellant, Scott Alan Zunker, and his co-defendants,[1] Valin Thomas Klock and Eric Vaughn Schultze, were indicted for the first-degree felony offense of aggravated sexual assault of the same complainant.[2] After appellant refused to enter a plea, the trial court entered a plea of not guilty on his behalf.[3] The jury found appellant and his co-defendants guilty and assessed punishments of 15 years in prison for appellant, 22 years for Klock, and 30 years for Schultze.

In seven points of error, appellant contends that the trial court erred in (1) denying appellant's request for a severance, (2) excluding evidence concerning prison conditions, (3) providing the jury with a general and ambiguous limiting instruction in the punishment charge, (4) denying appel-

lant's motion for mistrial at punishment, and (5) allowing improper closing argument. We affirm.

## Background

On November 19, 2000, College Station Police Department Detective Chad Harkrider was called to investigate the alcohol-related death of John Hickman at 3311 Bahia in College Station. When he arrived at the scene and discovered that there were numerous people to interview, Harkrider contacted College Station Police Sergeant Chuck Fleeger for assistance. Schultze and Klock were two of the people interviewed in connection with Hickman's death. During the course of the investigation, Detective Harkrider received an anonymous tip that there was a videotape of Hickman made on the night he died.

On March 27, 2001, Jana French, a friend of Klock's, provided the College Station Police Department with a videotape that she had obtained from Klock. Fleeger watched the videotape and discovered that, in addition to depicting Hickman the night he died, 18 minutes and 45 seconds of the tape showed three men sexually assaulting an unconscious female. Fleeger recognized Schultze and Klock as two of the three assailants because he had recently interviewed them in connection with Hickman's death. He later determined the identities of the complainant[4] and the third assailant, appellant.

1. Appellant's co-defendants also appealed their convictions. The Opinions for *Klock v. State*, 01–02–00265–CR, 2005 WL 90928, 177 S.W.3d 53, and *Schultze v. State*, 01–02–00210–CR, 2005 WL 90731, 177 S.W.3d 26, were issued simultaneously with appellant's Opinion.

2. *See* TEX. PEN.CODE ANN. § 22.021(a)(2)(A)(v) (Vernon Supp.2004–2005) (acts in concert with another toward same victim).

3. A trial court must enter a plea of not guilty on behalf of the defendant when *he refuses to* plead. TEX.CODE CRIM. PROC. ANN. art. 27.16(a) (Vernon 1989).

4. Before the police showed her the videotape, the complainant did not know that she had been assaulted. She testified that she worked with Klock at a pub, and she and some of her girlfriends were at a bowling alley when Klock and his friends arrived. Both groups

The sexual assault[5] began with appellant and Schultze entering a room where Klock was having sexual intercourse with the complainant, who appeared to be unconscious and physically unable to resist. Schultze, while manning the video camera said, "in her fucking cunt," and appellant attempted to insert a baseball into the complainant's vagina. Appellant manned the video camera while Schultze inserted the handle of a toilet plunger into the complainant's vagina. Schultze told appellant, "Make sure you get this on tape." When the plunger handle was inserted in the complainant's vagina, she moaned and said, "Ow. Stop," and continued to struggle. The three men laughed throughout the entire sexual assault. At one point, appellant lit a cigarette and burned the complainant's vagina with the lit cigarette. Appellant then, mockingly, said, "Ow. That's got to hurt," and he proceeded to flick ashes onto the complainant's buttocks. Appellant and Klock also inserted a screwdriver and other objects into the complainant's vagina. The men continued to laugh as they performed these various acts on the unconscious complainant, with Schultze declaring, "this is fucking hilarious" at one point during the assaults.

Police officers arrested appellant, Klock, and Schultze the day after Sergeant Fleeger received the videotape. Also on that day, police officers searched the house at 3311 Bahia and found a video camera and a camera bag that contained another videotape. This second videotape showed Schultze urinating on an unconscious Hickman.

During his investigation, Fleeger determined that the sexual assault occurred in July 2000, seven or eight months before the videotape was discovered.

## Severance

In points of error one and two, appellant argues that the trial court erred in denying appellant's motion for severance because (1) Klock had a prior admissible conviction and (2) a joint trial was so prejudicial to appellant that he was denied a fair trial at punishment.

Severance is not a matter of right, but rests within the sound discretion of the trial court. *Peterson v. State*, 961 S.W.2d 308, 310 (Tex.App.-Houston [1st Dist.] 1997, pet. ref'd). To show an abuse of discretion, an appellant bears the heavy burden of showing clear prejudice. *Id.*

A trial court must order a severance upon a timely motion and upon introduction of evidence that establishes either (1) that there is a previous admissible conviction against one defendant or (2) that a joint trial would be prejudicial to any defendant. TEX.CODE CRIM.PROC. ANN. art. 36.09 (Vernon 1981); *Aguilar v. State*, 26 S.W.3d 901, 903 (Tex.Crim.App.2000). Specifically, article 36.09 provides that:

> Two or more defendants who are jointly or separately indicted or complained against for the same offense or any offense growing out of the same transaction may be, in the discretion of the court, tried jointly or separately as to one or more defendants; provided that in any event either defendant may testify for the other or on behalf of the state; and provided further, that in cases in which, upon timely motion to sever, and

---

went to another pub and then on to a bar that appellant managed. There was excessive drinking, and the complainant did not remember any of the events occurring between the bar and waking up next to Klock in the Bahia house the next morning.

5. The description of the sexual assault is based on our review of the videotape as well as Sergeant Jeff Capps's testimony from the guilt stage of trial.

evidence introduced thereon, it is made known to the court that there is a previous admissible conviction against one defendant or that a joint trial would be prejudicial to any defendant, the court shall order a severance as to the defendant whose joint trial would prejudice the other defendant or defendants.

TEX.CODE CRIM. PROC. ANN. art. 36.09.

■ Generally, when two defendants are jointly indicted for the same offense, they should be tried jointly. *Dickerson v. State,* 87 S.W.3d 632, 639 (Tex.App.-San Antonio 2002, no pet.). However, the trial court may order separate trials, at its discretion. TEX.CODE CRIM. PROC. ANN. art. 36.09. If a joint trial would prejudice either defendant, upon proper motion to sever, the trial court must sever the trial of the defendant whose joint trial could prejudice the other. *Id.*

■ The mere allegation that prejudice will result is not evidence of, or a sufficient showing of prejudice, as required under article 36.09, particularly when the severance is discretionary with the trial judge. *Mulder v. State,* 707 S.W.2d 908, 915 (Tex.Crim.App.1986). If no evidence is offered in support of the motion to sever, the trial court does not err in overruling the motion. *See Sanne v. State,* 609 S.W.2d 762, 776 (Tex.Crim.App.1980).

## Klock's Conviction

■ In point of error one, appellant contends that the trial court erred and violated article 36.09 when it denied appellant's motion for severance because severance was mandatory in that Klock had a prior admissible conviction and appellant did not.

Appellant filed a pre-trial motion for severance, as well as a memorandum of law in support of his motion to sever. Neither of these pleadings mentioned Klock's conviction.[6] Both documents emphasized the prejudice appellant would suffer from the Hickman videotapes, the potential for differing defenses between the co-defendants, and the differing levels of culpability. During the hearing on the motion to sever, appellant admitted into evidence his prior criminal history, as well as those of Klock and Schultze. Neither the exhibits nor their contents were ever discussed during the hearing. At the conclusion of the hearing, the trial court asked the State to submit a brief outlining its arguments opposing severance, and the trial court afforded the defendants an opportunity to respond.

In his reply to the State's brief, appellant, for the first time, mentioned Klock's conviction for driving while intoxicated (DWI). The totality of appellant's reply on this point was as follows:

### C. Prior Criminal Conviction

The State alleges there was never any evidence presented during the severance hearing that any of the defendants have admissible prior convictions. The State's claim is false. During the severance hearing the Defendant offered the criminal histories of himself as well as his co-defendants. In this exhibit it clearly shows that Valin Klock was convicted for the offense of Driving While Intoxicated on September 22, 1998 in Comal County.

In its order denying the severance, the trial court stated that the defendants

---

6. In his brief to this Court, appellant asserts that, "in the memorandum, he pointed out to the trial court that Article 36.09 V.A.C.C.P. required a severance in the event that one defendant has no prior admissible convictions while another co-defendant does." Although appellant "pointed out" the statute, he never "pointed out" to the trial court that one of appellant's co-defendants had a prior conviction.

moved for severance for several reasons including: the possibility of the introduction of separate video sequence, antagonistic defenses, differing levels of culpability, and implication through statements of co-defendants. Whereas, the State urged that the cases be tried together because a single trial would lessen the trauma to the victim, a single trial would reduce the chances of potentially disparate sentences, and judicial economy would be best served with one trial.

The trial court found that "after a careful consideration of the evidence presented at the pretrial hearing, and the arguments presented by counsel, it is the opinion of the Court that defendants have failed to meet their 'heavy burden' showing 'clear prejudice.'" Because none of the defendants raised the "prior conviction" ground in his motion for severance, the trial court's order addressed only the prejudice factor, not the prior conviction factor.

To preserve error for appeal, a defendant must (1) object, (2) state the grounds with sufficient specificity, and (3) obtain an adverse ruling. TEX.R.APP. P. 33.1; *see* *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim.App.2002). Here, appellant objected to a combined trial because of potential prejudice, not Klock's prior conviction; he did not make a specific enough objection because the trial court did not make a ruling based on prior convictions, and finally, appellant did not obtain an adverse ruling on the prior conviction issue. Appellant has not preserved error on the denial of severance based on Klock's prior conviction.

We overrule point of error one.

### Joint Trial Too Prejudicial

■ In point of error two, appellant argues that the trial court abused its discretion in denying appellant's motion for severance because a joint trial was so prejudicial to appellant that he was denied a fair trial at punishment.

Appellant was concerned that he would be prejudiced if he was forced to stand trial with Klock and Schultze, and appellant's attorney argued at the pre-trial severance hearing that appellant and Klock had shown remorse, but Schultze had not. Appellant's lawyer argued that appellant "might be punished or the bar might be raised on his punishment because of the arrogance and the statements that are made in the Schultze confession." Further, appellant's lawyer stated that he "viewed the Hickman death as being more inflammatory than the actual facts of this case.... The actions against Mr. Hickman, I fear, are going to rub off on my client and increase his punishment."

Appellant presented evidence of the criminal history and bad acts of both Klock and Schultze. Appellant contended that the disparity between the criminal history and bad acts of appellant and that of Klock and Schultze was "significant." Appellant's only "blemish" was that he had previously received deferred adjudication community supervision for harassment of a neighbor. In contrast, Klock's history revealed convictions for (1) DWI, (2) DWI-second, (3) assault-bodily injury, (4) possession of marihuana, (5) possession of controlled substance, (6) possession of drug paraphernalia, (7) driving while license suspended, (8) reckless damage or destruction of property, (9) disorderly conduct-noise, and (10) and (11) two failures to appear. With respect to Schultze, the State presented the Hickman videotapes, in addition to evidence that Schultze had previously harassed his neighbors, had damaged a neighbor's yard, had stolen a painting from the wall of a restaurant, had a pending felony aggravated assault charge stemming from a fight with his ex-girlfriend's boyfriend, and had been arrest-

ed for evading arrest after leading police on a chase where speeds exceeded 100 miles-per-hour.

Appellant acknowledges that the trial court repeatedly instructed the jury not to consider the Hickman videotapes and Schultze's and Klock's various unadjudicated offenses as evidence against appellant. Despite having requested many of the instructions, appellant now argues that "it is reasonable to conclude that the greater the number of limiting instructions given to the jury the greater the likelihood of confusion and unfair prejudice." He asserts, as stated by the Dallas Court of Appeals, that there is a "limit to the number of times a skunk can be thrown into the jury box with instructions not to smell it." *See Young v. State,* 752 S.W.2d 137, 145 (Tex. App.-Dallas 1988, pet. ref'd).

During its opening statement at punishment, the State informed the jury that the Hickman videos were "offered to show you something about Eric Schultze." Sergeant Fleeger testified that neither appellant nor Klock was present on the Hickman videos. The record is replete with instructions from the trial court informing the jury not to consider the evidence presented against the other defendants when deciding appellant's punishment. Where the jury sentenced Schultze to 30 years in prison, Klock to 22 years in prison, and appellant to only 15 years, there is no indication that the jury was unable to follow the trial court's instructions.

We hold that appellant has failed to meet his heavy burden of showing that the trial court abused its discretion when it found that appellant did not show clear prejudice would result from a joint trial. *See Peterson,* 961 S.W.2d at 310.

We overrule point of error two.

## Erroneously Excluded Evidence

In points of error three and four, appellant argues that the trial court erred during the punishment stage of the trial in excluding evidence concerning prison conditions because such evidence was relevant and admissible to rebut the false impression created by the State.

We review a trial court's decision to admit or exclude evidence for abuse of discretion. *Green v. State,* 934 S.W.2d 92, 101–02 (Tex.Crim.App.1996). Where the trial court's evidentiary ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and the reviewing court must uphold the trial court's ruling. *Id.* All relevant evidence is admissible, except as otherwise provided by Constitution, by statute, by the rules of evidence, or by other rules prescribed pursuant to statutory authority. TEX.R. EVID. 402. Evidence is relevant if it tends to make the existence of any consequential fact more or less probable than it is without the evidence. TEX.R. EVID. 401. However, after the defendant has been found guilty, evidence may be offered by the State and the defendant "as to any matter the court deems relevant to sentencing." TEX.CODE CRIM. PROC. ANN. art. 37.07 § 3(a)(1) (Vernon Supp.2004–2005).

The erroneous admission or exclusion of evidence does not result in reversible error unless it affects a substantial right of the accused. *See* TEX.R.APP. P. 44.2(b); *Alexander v. State,* 137 S.W.3d 127, 130 (Tex. App.-Houston [1st Dist.] 2004, pet. ref'd). Substantial rights are affected when the error has a substantial and injurious effect or influence in determining the jury's verdict. *King v. State,* 953 S.W.2d 266, 271 (Tex.Crim.App.1997).

During the punishment stage, appellant's attorney called Reginald Jenkins as a witness. Jenkins is a detention officer with the Brazos County Sheriff's Depart-

ment, and he was previously employed as a prison guard at a maximum security prison. Jenkins testified that appellant had been a "model inmate" during his more than 300 days of detention at the time of trial. Jenkins explained what a normal day is like for appellant while in detention, and that, due to his conviction for aggravated assault, he cannot become a prison trustee. Klock's attorney questioned Jenkins about the conditions in maximum security prisons. Jenkins testified that it was "very possible" that the defendants would be going to a maximum security prison, which holds murderers, major drug dealers, embezzlers, and forgers. He further testified that there is "rampant gang affiliation" in prison.

On cross-examination, the State elicited more testimony regarding the conditions in prison. Jenkins testified that rigid laws regulate prisons to make sure they are safe. Prison units have job fairs and classes allowing inmates to get degrees ranging from G.E.D.s to Ph.D.s, and law libraries that are second to none. Prison units also have exercise weights, baseball diamonds, basketball courts, and horseshoes. Each prison unit has a minimum of two televisions in each dayroom, and inmates are allowed to see the National Basketball Association finals and the Super Bowl on television.

On re-direct examination, Schultze's attorney asked Jenkins if he felt it would be helpful to hear from someone who "was actually on the inside looking out." Jenkins responded, "possibly."

■■ Later, appellant's attorney called Leroy Hall to testify about the time that he served in the Texas Department of Corrections from 1990–1997. The State objected that the testimony from Hall concerning prison conditions was irrelevant. Appellant's attorney responded that the State had "opened the door to the country

club atmosphere," and the trial court originally agreed. When the State added that the witness was an expert, who had not been properly designated, the trial court overruled that objection as well.

After appellant's attorney asked Hall a few more questions, the trial court began sustaining the State's relevance and invading-the-province-of-the-jury objections. The trial court then discussed the rulings with the attorneys outside the presence of the jury and reconsidered and sustained the State's relevance objection. The defendants' attorneys made a bill of exception, and, at the conclusion of the bill, the trial court clarified that Hall's testimony was inadmissible, and the court instructed the jury to disregard it. The trial court stated that it based its decision on

401, the relevance. I'm also basing my decision on the fact that I did not believe the door was opened by the State. Number three, I'm making my decision on the fact that ... I still think 701 and 702 may apply and there should have been a notice given that this person was an expert witness.

On appeal, appellant contends that (1) Hall's evidence was necessary to rebut a false impression left by the State about prison life, (2) Hall was not an expert, and (3) Hall's testimony was relevant because the State had "opened the door."

■■ The Court of Criminal Appeals has explained that, under article 37.07 section 3(a), the admissibility of evidence at the punishment phase of a non-capital felony trial is a function of policy rather than relevancy. *See Mendiola v. State*, 21 S.W.3d 282, 285 (Tex.Crim.App.2000); *Miller–El v. State*, 782 S.W.2d 892, 895 (Tex.Crim.App.1990). This is so because, by and large, there are no discrete factual issues at the punishment stage. *Miller–El*, 782 S.W.2d at 895–96. Thus, determin-

ing what is "relevant" in regard to punishment, under article 37.07 section 3(a), "should be a question of what is helpful to the jury in determining the appropriate sentence in a particular case." *Mendiola*, 21 S.W.3d at 285. In *Schielack v. State*, 992 S.W.2d 639 (Tex.App.-Houston [14th Dist.] 1999, pet. ref'd), when faced with the attempt to introduce similar evidence to that which was attempted to be introduced here, the Fourteenth Court of Appeals held as follows:

> In the present case, the testimony which [Schielack] sought to introduce was neither [evidence of the circumstances of the offense itself or the defendant himself]. In fact, the testimony consisted of another person's experiences in prison. There is no evidence that [Schielack's] experience would be the same. As such, we believe that the trial court's decision to exclude this testimony was at least within the zone of reasonable disagreement; therefore, the trial court did not abuse its discretion.

*Id.* at 642–43.

Appellant argues that *Schielack* is not instructive because it was distinguished by the Waco Court of Appeals in *Najar v. State*, 74 S.W.3d 82 (Tex.App.-Waco 2002, no pet.). In *Najar*, Warden Botkin did not give testimony in the form of an opinion, lay or expert. *See id.* at 86 (citing Tex.R. Evid. 701, 702). She was never asked to express an opinion. *Id.* Thus, she was a fact witness whose testimony was challenged solely on the basis of its relevancy. *Id.* *Najar* stated that *Schielack*

> is distinguishable from the present case because Botkin testified that inmates similarly-situated to Najar— same offense, no history of violence or aggression, no behavioral problems while incarcerated—would be placed into "minimum custody" and be immediately eligible for all appropriate pris-

on programs; prison overcrowding is not an obstacle to expeditious placement into programs. Therefore, the warden's testimony was not merely speculative as to Najar. Furthermore, *Schielack* did not hold that evidence about prison conditions is *per se* irrelevant; *Schielack* stands only for the principle that its relevancy depends on the facts and circumstances of the case.

*Id.* at 87. We agree with *Najar's* characterization of the holding in *Schielack*. We do not, however, agree that *Najar* is more instructive than *Schielack* in this case.

During the defendants' bill of exception, Hall testified, at length, about the consequences of being "fresh meat" in prison. After the recitation, appellant's attorney and Schultze's attorney asked Hall to comment as to whether each of the defendants would be treated as "fresh meat." Appellant's attorney asked appellant to stand and then asked Hall, "What about a white male that's never been to prison before that's his size and weight. Is he going to be considered fresh meat or not?" Schultze's attorney then asked Schultze to stand, and he asked Hall, "Are the things that you said pertaining to Mr. Zunker ..., would that go for Mr. Schultze as well?" Hall responded, "Yes. It will go for anybody that goes into the system that's never been there before." Hall's testimony was describing prison life as he had observed it several years before, rather than present prison life that was described by the warden in *Najar*.

The trial court could have reasonably concluded that Hall's testimony would not have been helpful to the jury in determining the appropriate sentence in this case. Also, the trial court could have reasonably concluded that Hall's testimony went beyond the scope of any door opened by the State. Under the precedent of *Mendiola*,

the trial court's decision to exclude the testimony of Hall was at least within the zone of reasonable disagreement.

Accordingly, we hold that the trial court did not err in excluding his testimony. Having held that the trial court did not err in excluding Hall's testimony, we need not determine whether Hall was a properly designated expert.

We overrule points of error three and four.

## Jury Instruction

■ In point of error five, appellant argues that he suffered egregious harm because a limiting instruction regarding the extraneous offenses of Schultze in the court's charge at punishment was so general and ambiguous that it failed to limit the jury's consideration of evidence in assessing punishment to Schultze as the person against whom the evidence was admitted.

■ When a complaint is raised on appeal regarding error in the trial court's charge to the jury, a reviewing court must determine whether the charge was erroneous, and, if so, whether the error was harmful to the defendant. *See Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App. 1984). The State may offer evidence of extraneous offenses during the punishment phase of the trial. TEX.CODE CRIM. PROC. ANN. art. 37.07 § 3(a)(1). The trial court, as it did here, must charge the jury that it can only consider such evidence if it finds beyond a reasonable doubt that the defendant committed the offenses. *See Huizar v. State,* 12 S.W.3d 479, 483–84 (Tex.Crim. App.2000).

Here, the trial court's charge, at punishment, contained the following instruction:

You are further instructed that any act or acts which have been introduced against any defendant in this case can only be used against that defendant in determining his punishment and can not be considered by you in determining the punishment of any other defendant.

Appellant did not object to this instruction. Now, however, he complains that the instruction was so general and ambiguous that it failed to limit the jury's consideration of evidence in assessing punishment to Schultze as the person against whom the evidence was admitted.

Appellant acknowledges, that, because he did not object to the instruction when given to the jury, he must establish that he suffered egregious harm due to the instruction. *See Abdnor v. State,* 871 S.W.2d 726, 732 (Tex.Crim.App.1994); *Almanza,* 686 S.W.2d at 171. Appellant contends that he suffered egregious harm because the jury instruction was too vague and general to prevent the jury from considering the Hickman videos against appellant when assessing punishment.

Assuming, without deciding, that there was error in the instruction, appellant has failed to show that he did not receive a fair trial. *See Almanza,* 686 S.W.2d at 171 (holding that appellant must show erroneous charge caused egregious harm preventing fair and impartial trial). The jury saw the Hickman videos and heard testimony from several witnesses that appellant was not involved or present during the filming of either episode. Appellant has presented nothing to show that the jury considered the Hickman videos against him because of the absence of a more specific instruction.

We overrule point of error five.

## Jury Argument

In point of error six, appellant argues that the trial court erred in denying his motion for mistrial when the State argued to the jury at punishment that "they had

watched their best friend die" because there was no evidence that appellant was even present at the time of Hickman's death. In point of error seven, appellant contends that the trial court erred during the punishment stage of trial in overruling appellant's objection to the State's closing argument about a matter outside the record.

 The law provides for, and presumes, a fair trial, free from improper argument by the State. *Long v. State,* 823 S.W.2d 259, 267 (Tex.Crim.App.1991). Proper jury argument generally must encompass one of the following general areas: (1) a summation of the evidence presented at trial; (2) a reasonable deduction drawn from that evidence; (3) an answer to the opposing counsels argument; or (4) a plea for law enforcement. *Guidry v. State,* 9 S.W.3d 133, 154 (Tex.Crim.App. 1999); *Sandoval v. State,* 52 S.W.3d 851, 857 (Tex.App.-Houston [1st Dist.] 2001, pet. ref'd). To determine whether a party's argument properly falls within one of these categories, we must consider the argument in light of the entire record. *Sandoval,* 52 S.W.3d at 857. In most cases, if error occurs, an instruction to disregard will cure any error committed. *Shannon v. State,* 942 S.W.2d 591, 598 (Tex.Crim. App.1996).

## Motion for Mistrial

 During closing argument at the punishment stage, the prosecutor stated that "These three Defendants need to be held accountable for the total and continued disregard for life and for the law. They had chances. They've been in trouble before. They watched their best friend die of a drug and alcohol overdose." The trial court sustained appellant's objection and instructed the jury to disregard the last statement, but denied the motion for mistrial.

At almost every mention of the Hickman videotapes throughout the trial, the trial court instructed the jury that the evidence introduced against one party cannot be considered against any other party. The jury saw the Hickman videotapes and heard testimony describing who was present during the filming of the videotapes.

We presume the instruction was sufficient to cure any harm. *See Gardner v. State,* 730 S.W.2d 675, 696 (Tex.Crim.App. 1987); *Pineda v. State,* 2 S.W.3d 1, 11 (Tex.App.-Houston [1st Dist.] 1999, pet. ref'd). Once again, appellant has shown nothing to the contrary.

We overrule point of error six.

## Outside the Record

 In point of error seven, appellant contends that the trial court erred in overruling appellant's objection after the State argued matters outside the record during its final argument in the punishment stage of trial.

During closing argument at the punishment stage, the State argued:

> Imagine the embarrassment, the humiliation that [the complainant] has had to go through. Every time you think about the excuses the Defendants offered, think about [her], what she's going through, what her parents are going through, what her dad is thinking knowing that his little girl was violated in the worst way.

The trial court overruled appellant's objection that the State's argument was outside the record. Appellant argues that this statement was a direct violation of the trial court's ruling on a motion in limine "that the State's attorney not mention or state to the jury the probable testimony of any witness who is absent or unavailable and was not called to testify in this cause."

The complainant's parents did not testify; therefore, the argument was outside the record, and the trial court erred in overruling appellant's objection. Appellant concedes that "arguments which are outside the permissible bounds of jury summation are not constitutional errors and thus are subject to the harm analysis established by Tex.R.App. P. 44.2(b)." Rule 44.2(b) provides that a nonconstitutional error "that does not affect substantial rights must be disregarded." TEX. R.APP. P. 44.2(b). Determining harm under that standard in improper argument cases requires balancing the following three factors: (1) severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the certainty of conviction/punishment absent the misconduct. *Id.; Mosley v. State*, 983 S.W.2d 249, 259 (Tex.Crim.App.1998).

### Severity of the Misconduct

In *Martinez v. State*, 17 S.W.3d 677 (Tex.Crim.App.2000), the Court of Criminal Appeals was faced with a similar issue when it was asked to reverse a death penalty conviction in light of the following jury argument at the conclusion of the punishment stage of trial:

> PROSECUTOR: And based on this evidence, this—this rates as one of the worst crimes, one of the worst killings not only in Brazoria County but the State of Texas.
>
> DEFENSE COUNSEL: Objection, your honor. That's not in the record.
>
> THE COURT: Stay in the record, counsel.
>
> PROSECUTOR: The evidence shows you, these were execution killings. 26 to 28 bullets. The family of the murdered victims, the family-the victims themselves, they cry out to you, for the death penalty in this case. There's no more—

> DEFENSE COUNSEL: Objection, your Honor. Not in the record, either. Absolutely no evidence of that.
>
> THE COURT: Overruled.
>
> PROSECUTOR: Justice in this case requires you, because we told you from day-one, what we wanted was a fair jury, a jury that would do justice in this case.

*Martinez*, 17 S.W.3d at 692. The court concluded that

> the degree of misconduct, if any, was relatively mild in the present case. The prosecutor's comment that the victims and their families cry out for the death penalty appears to be intended as a plea for law enforcement. The jury was in a position to know that victims who are dead cannot presently cry out for the death penalty, and that, given the facts surrounding their deaths, no such cries were made before they died. *Nor would the jurors be surprised to hear that the victims' families would be upset with appellant or that they would want retribution. And the prosecutor did not attempt, through this argument, to convey any specific facts about the effect of the victims' deaths upon their families.* Instead, the prosecutor was pleading with the jury to give the death penalty because the record before the jury showed that the defendant deserved it. To the extent that the prosecutor conveyed facts outside the record, such facts had no tendency to adversely influence the jury against appellant beyond the influence exerted by a wholly legitimate plea for law enforcement.

*Id.* at 693 (emphasis added). Here, like in *Martinez*, the prosecutor's comments did not attempt to convey *specific* facts about the effect of the complainant's assault upon her family so much as it was conveying matters that the jury would not be surprised to hear because they are obvious or

common knowledge. Accordingly, we conclude that the degree of misconduct was minimal.

### Curative Measures

The trial court did not make any attempt to cure the misconduct.

### Certainty of Punishment Absent the Misconduct

Appellant was found guilty of the first-degree felony offense of aggravated sexual assault—an offense punishable by imprisonment for life or for a term of not more than 99 years or less than 5 years. *See* Tex. Pen.Code Ann. § 12.32 (Vernon 2003). If a jury sentences an individual to less than 10 years, it may recommend to the trial court that the imposition of the sentence be suspended and that the defendant be placed on community supervision. Tex. Code Crim. Proc. Ann. art 42.12, § 4(a), (d)(1) (Vernon Supp.2004–2005). Here, the jury assessed punishment at 15 years in prison. To evaluate the "certainty of the punishment absent the misconduct," we must examine all the evidence presented during punishment.

### State's Witnesses

The jury saw the videotape of Hickman taken shortly before his death. Sergeant Fleeger testified that neither appellant nor Klock was present in the Hickman video. Fleeger and Detective Harkrider both testified that appellant, Schultze, and Klock were not peaceful, law-abiding citizens, and that they have bad reputations in the community.

Karen Rogers, who lived next door to the Bahia house, testified that she was "afraid to go outside" when Schultze was outside.[7] She reported that, at 7:50 a.m. on December 15, 2000, Schultze yelled at her as she tried to get in her car to go to work. He yelled, "I hate my cock-sucking fucking cock-sucking neighbors and that they were all cock-suckers," and he threw a beer bottle at her. Rogers called the police, and Schultze told her that "he was going to be [her] worst nightmare" until she moved out. Tim Rogers, Karen's husband, went outside and confronted Schultze and, during the confrontation, Tim accused the residents of the Bahia house of failing to take care of their friend who died. Appellant, who had walked up while Schultze and the Rogerses were arguing, threatened to kill Tim.

Police Officer David Robinson responded to Karen Rogers's call to the police. He testified that he took appellant's and Schultze's statements, and he did not believe that either of them was intoxicated when the threat to kill Tim Rogers was made. Appellant received deferred adjudication for the incident.

### Defense Witnesses

As previously discussed, the jury heard from Brazos County Sheriff Department Officer Reginald Jenkins. In addition to testifying about prison conditions discussed above, Jenkins testified that he has had contact with appellant 10 to 14 times a day during the year he has been incarcerated awaiting this trial. Jenkins testified that appellant "is an extremely quiet person, stays to himself, rarely comes out of his cell." He said that he has had no problems with appellant and, to the extent that there is such a thing, appellant has been a model prisoner. Jenkins testified that appellant did not take advantage of the drug and alcohol abuse treatment program that was available to the inmates.

7. Rogers testified that she was "uncomfortable" around appellant and Klock "but not as afraid" as she was around Schultze.

The jury heard testimony from Mike Patterson, the assistant chief of the College Station police department, concerning the events surrounding the threat that appellant made to Tim Rogers. Patterson testified that he attempted to ask appellant questions, but Schultze would answer for him. Patterson separated appellant from Schultze and questioned him about the confrontation. Appellant explained that Karen Rogers had said something about his friend who had died, and "that got him mad." Appellant told Patterson that he "never swore" at Tim Rogers. When he was asked if he felt appellant lied to him, Patterson responded, "I felt like he was (sic) wasn't fully truthful. I wasn't sure he was trying to be super deceptive, but I think he felt that he was in a bad place." Patterson testified that appellant pleaded guilty after being charged with threatening Tim Rogers.

Appellant testified during punishment that he remembered "growing up at the bar" with his father. His parents were divorced, and he lived with his father until his father's girlfriend took appellant's money from him. He moved back in with his mother, but he rebelled against her rules. He started drinking alcohol as a sophomore in high school and was getting intoxicated every weekend by his senior year in high school. During high school, he was arrested for minor in possession and public intoxication. He was living in Vernon, Texas with his mother and visiting Eric Schultze's brother in College Station when this sexual assault occurred. He later moved to College Station. Appellant testified that he "looked up to" Schultze and was in awe of him because he "partied hard, drank a lot of beer." Appellant explained that there were "a lot of good-looking girls always around him." Working at the bars gave appellant access to alcohol any time he wanted. Appellant testified that there was no doubt that Schultze was the "leader" of the Bahia house. Schultze would do things to exercise control over the group. For example, appellant had a friend come in town to visit, and Schultze assaulted him in the parking lot outside the bar. On another occasion, after appellant had been arrested, but before he was on probation, he stopped going out "partying" with Schultze. Schultze would call him and tell him that he was a "pussy for not coming drinking with them and stuff."

Appellant remembered that, on the night of the sexual assault, they went bowling and "drank a lot of beer." Appellant then drove to the Blarney Stone where they stayed and drank "a lot more" even after the bar closed. They left around 4 a.m. He does not remember how he got to the Bahia house, and he remembers parts, but not all of the events of the evening. He remembered walking in and seeing Klock on top of the complainant and "the part about the baseball and cigarette." He remembered waking up on the couch hung over and knowing that something bad had happened. He left the Bahia house and drove home to Vernon, Texas the day after the assault. Appellant expressed remorse for the part that he played in the assault and stated that has accepted God into his life and he prays that God would take away the night that this assault happened.

On cross-examination, appellant admitted that, in the video, it appears that he inserted the screwdriver in the complainant's vagina. He testified that he had no memory of that portion of the video. He also agreed that, on the video, it appeared that he was trying to "get [the baseball] into her vagina." He further agreed that they were looking for things in the room to insert in the complainant's vagina. Finally, appellant admitted that there was no

question in his mind that the Bahia house neighbors were "terrorized" by them.

Next, Ryan Miller testified that she dated appellant for one month. She testified that, despite having shared the same bed with him, appellant never forced himself on her, and she was shocked to hear that he had been arrested for this assault.

Brandon Caddell testified that he had known appellant since the sixth grade. Appellant "stood up for what he believed in and didn't let anybody push him around." Brandon's father is a pastor, and appellant regularly attended church with them. Brandon described appellant as a "sweet talker" to girls and "a big teddy bear."

Stephen Caddell, a pastor in San Antonio and Brandon's father, told the jury that appellant was a well-manned and polite boy who met Caddell's approval. He testified that appellant had leadership potential.

Cheryl Quernner, appellant's mother, testified that appellant was 10 when she and appellant's father got divorced. Appellant comes from a family of people with drinking problems, and he would get intoxicated in high school. Appellant has a need to be accepted and he will try to fit in to whatever group he is with. The jury heard that "all of [appellant's] girlfriends, past girlfriends are still very close to [him].... The girls have nothing but good things to say." Quernner testified that appellant would not let his family visit him in jail—he was too embarrassed. She said that he had been transformed while in jail and had real remorse so she believed that he could succeed on probation.

Brooke Bolton testified that she has known appellant since eighth grade. She has been intoxicated around him, and he has never taken advantage of her. She described appellant as her friend, and she "love[s] him to death."

Sabre Bofannon testified that she has known appellant for about six years. She described appellant as "a real outgoing person. He's a real friendly guy. He's overall a really nice guy." She testified that she had been "intimate" with appellant, and he was never forceful or aggressive, and he always respected her when she said, "no." She described to the jury how appellant's personality changed when he moved to College Station. He "was more worried about what his friends thought here [in College Station] than about us. He just wasn't the same person."

Lastly, Marvin Sharp testified that his son and appellant were friends. Appellant stayed over at the Sharp house in Vernon a lot, and appellant had excellent manners, was well-behaved, and polite and respectful to Sharp and his wife. He described appellant as a "follower." Appellant dated Sharp's niece, and Sharp never heard any problems about that relationship. Appellant had a key to the Sharp's house, and they found him to be "quite trustworthy."

### Rebuttal Witnesses

Sergeant Fleeger testified again and stated that, "based on the heinousness of the crime" and his "knowledge ... [of] arrests of the Defendants before and after their arrests for this case," he did not believe the defendants deserved probation. He acknowledged that he had never recommended probation as a witness, but believed that sometimes it is appropriate.

Here, the jury heard testimony from 10 of appellant's witnesses. They all testified that appellant came from a troubled home, but was a good guy and a follower. In addition, the jury saw videotape evidence of appellant engaging in truly barbaric behavior—the sexual assault of an unconscious young woman—by Schultze insert-

ing a toilet plunger handle in her vagina and his suggesting that appellant and Klock force a baseball in her vagina, while Schultze manned the video camera. The videotape also showed appellant burning the complainant's vagina with a lit cigarette, and then, mockingly, said, "Ow. That's got to hurt," before he flicked ashes on the complainant's buttocks. The videotape also showed appellant and Klock inserting a screwdriver blade into the complainant's vagina. Appellant's misconduct was further emphasized by his laughter at the complainant during the assault, while Schultze declared that this was "fucking hilarious." The jury also heard testimony from several policemen who testified that the defendants were not law-abiding citizens.

Taking all of the evidence into consideration, and in light of our holding that the argument did not constitute severe misconduct, we hold with fair assurance that the trial court's error in overruling appellant's objection to the above argument did not influence the jury and did not affect his substantial rights.

We overrule point of error seven.

### Conclusion

We affirm the judgment.

Justice JENNINGS dissenting.

TERRY JENNINGS, Justice, dissenting.

Because the appropriate standard for determining the harm of the State's improper punishment argument requires that this case be reversed and remanded for a new punishment hearing, I respectfully dissent.

In his seventh point of error, appellant contends that the trial court reversibly erred in allowing the State to make the following argument:

[State]: Imagine the embarrassment, the humiliation that [the complainant] had to go through. *Every time you think about the excuses* the Defendants offered, *think about* [her], what she's gone through, *what her parents are going through, what her dad is thinking knowing that his little girl was violated in the worst way.*

[Appellant]: Judge, I'll object. There is no evidence as to what her parents were thinking as to even their presence [sic] here in the courtroom.

[Trial Court]: Overruled.

(Emphasis added.) As conceded by the State during oral argument in this Court, there is, in fact, no evidence in the record that the complainant's parents were even living at the time of the offense or aware that the complainant had been sexually assaulted.

The law provides for, and presumes, a fair trial free from improper argument by the State. *Long v. State*, 823 S.W.2d 259, 267 (Tex.Crim.App.1991). It is well-settled that a prosecutor cannot use closing argument to place matters before the jury that are outside the record and prejudicial to the accused. *Everett v. State*, 707 S.W.2d 638, 641 (Tex.Crim.App.1986); *Thompson v. State*, 89 S.W.3d 843, 850 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). Arguments referencing matters that are not in evidence and may not be inferred from the evidence are usually "designed to arouse the passion and prejudices of the jury and as such are highly inappropriate." *Thompson*, 89 S.W.3d at 850 (quoting *Borjan v. State*, 787 S.W.2d 53, 57 (Tex.Crim.App.1990)).

Here, the State invited the jury, "*every time*" it considered the defendants' punishment arguments, to instead focus on what her parents were "going through" and, in particular, "*what her dad is think-*

*ing knowing* that his little girl was violated in the worst way." (Emphasis added.) It is readily apparent that the State, in an effort to completely nullify the defendants' punishment arguments, sought to inflame the "passions and prejudices of the jury," especially those members of the jury who were parents. This highly prejudicial argument was egregiously inappropriate, and the trial court gravely erred in overruling appellant's objection, an objection which so obviously should have been sustained.

Appellant concedes that the trial court's error in overruling his objection was non-constitutional and that the appropriate harm standard of review provides that such an error "that does not affect substantial rights must be disregarded." Tex. R.App. P. 44.2(b). In *Hawkins v. State,* the Court of Criminal Appeals has recently held that determining harm under this standard concerning improper punishment argument in non-capital cases requires balancing three factors: (1) the severity of the misconduct (prejudicial effect), (2) curative measures, and (3) the *certainty* of the punishment assessed absent the misconduct (likelihood of the same punishment being assessed). 135 S.W.3d 72, 77 (Tex. Crim.App.2004).

In regard to the first factor, the State's argument, asking the jurors to substitute their thoughts "about ... what her parents are going through, what her dad is thinking knowing that his little girl was violated in the worst way" in place of appellant's punishment arguments, when there is absolutely no evidence whatsoever that the complainant's parents were even aware of the sexual assault, was a flagrant attempt to arouse the passion and prejudices of the jury. The degree of such misconduct is not "minimal," and, as noted above, such an argument, "designed to arouse the passion and prejudices of the jury," is "highly inappropriate." *Thomp-*

*son,* 89 S.W.3d at 850 (quoting *Borjan,* 787 S.W.2d at 57).

The trial court, in regard to the second factor, made no attempt at all to correct the State's misconduct. The bottom line is that it simply failed to sustain appellant's proper objection to an obviously improper argument. Moreover, the trial court's failure to sustain appellant's objection to the argument borders on constitutional error. *See Thompson,* 89 S.W.3d 843, 852 (noting that State's argument "by urging the jury to consider matters not before them, and while effectively acknowledging that to do so was a violation of their solemn oath as jurors ... violated the Due Process Clause of the Fourteenth Amendment and implicated the Confrontation Clause of the Sixth Amendment.").

Finally, in regard to the third factor, appellant faced the widest possible range of punishment provided for an offense in the Texas Penal Code: confinement in prison "for life or for any term of not more than 99 years or less than 5 years." Tex. Pen.Code Ann. § 12.32 (Vernon 2003). If the jury had sentenced appellant to confinement for 10 years or less, it could have recommended to the judge that the imposition of appellant's sentence be suspended and that appellant be placed on community supervision. Tex.Code Crim. Proc. Ann. art. 42.12 §§ 4(a), (d)(1) (Vernon Supp. 2004–2005).

Given the wide range of possible punishment, the *certainty* of appellant's sentence, confinement for 15 years, absent the State's misconduct cannot be considered separate and apart from the severity of the State's misconduct. As noted in the majority opinion, appellant presented numerous character witnesses who testified on his behalf in the punishment phase of trial. Although, as noted in the majority opinion, the credibility of their character testimony may have been brought into question un-

der cross-examination, an intermediate court of appeals is not a fact-finder. More importantly, the simple fact remains that the State, regardless of the actual evidence before the jury for its consideration in assessing punishment, invited the jury, *"every time"* it considered appellant's punishment arguments to simply focus on what the complainant's parents were "going through," and, in particular, "what her dad is thinking knowing that his little girl was violated in the worst way"—matters which were not in evidence. This was not a mere "plea for law enforcement" as discussed in *Martinez v. State,* 17 S.W.3d 677, 693 (Tex.Crim.App.2000). In effect, the State argued that the jury should ignore the evidence and focus on the specific facts about the effect the offense had on the complainant's parents. Given the severity of this misconduct and its highly prejudicial nature, it cannot be said with certainty that the jury, absent the misconduct, would likely have assessed the "same punishment" of confinement for 15 years.

The facts of this case are truly ugly, but the severity of the offense did not relieve the trial court of its solemn obligation to "preserve, protect, and defend the Constitution and laws of the United States and of this State." In fulfilling this duty, we, as judges, should remember the words of Justice Felix Frankfurter: "A timid judge, like a biased judge, is intrinsically a lawless judge." *Wilkerson v. McCarthy,* 336 U.S. 53, 65, 69 S.Ct. 413, 419, 93 L.Ed. 497 (1949) (Frankfurter, J. concurring). I cannot conclude with "fair assurance," as is required by the rule of law, that the trial court's error in overruling appellant's proper objection to the State's highly inappropriate argument "did not influence the jury, or had but a slight effect." *See Reese v. State,* 33 S.W.3d 238, 243 (Tex. Crim.App.2000). Accordingly, I would grant appellant's motion for rehearing, sustain his seventh point of error, and

reverse and remand the case for a new punishment hearing.