**Opinion issued March 28, 2024**



In The

# Court of Appeals

For The

# First District of Texas

————————————

### NO. 01-22-00195-CR

————————————

### WILLIAM TRAVIS KITCHENS, Appellant

### V.

### THE STATE OF TEXAS, Appellee

On Appeal from the 178th District Court
Harris County, Texas
Trial Court Case No. 1502983

## MEMORANDUM OPINION

A jury convicted appellant William Travis Kitchens of murder in 2018 and assessed his punishment at 15 years' confinement. He appealed, and this Court affirmed the conviction but remanded for a new punishment hearing so that the jury could be instructed regarding sudden passion. *See Kitchens v. State*, No. 01-

18-00518-CR, 2019 WL 6482408, *13–14 (Tex. App.—Houston [1st Dist.] Dec. 3, 2019, pet. ref'd) (mem. op., not designated for publication). His punishment was retried in 2021, and the jury rejected his sudden-passion claim and assessed his punishment at 25 years' confinement. Kitchens now appeals that sentence, arguing that: (1) the trial court erred in overruling Kitchens's objections to the State's emphasis on the race of the complainant during closing argument; (2) the State engaged in prosecutorial misconduct that violated Kitchens's due process rights by injecting race into the trial proceedings via its comments during closing argument; and (3) the trial court erred in failing to hold a hearing on Kitchens's motion for new trial.

We conclude that the trial court did not err in denying Kitchens's various complaints regarding the State's closing arguments, nor did the trial court err in failing to hold a hearing on the motion for new trial. Accordingly, we affirm.

## Background

The facts underlying Kitchens's murder conviction are set out thoroughly in this Court's 2019 opinion. *See id.* at *1–3. Kitchens was convicted of murder in the March 7, 2016 shooting death of Hipolito Desoto. *Id.* at *1. On that morning, 44-year-old Desoto rode his motorcycle to Kitchens's auto-repair shop, IDB Racing, which provided repair and restoration services for high-end cars. Kitchens was in his office when he saw Desoto ride by on his motorcycle just before 10:00 a.m. *Id.*

2

Kitchens, who was age twenty-nine, five feet and seven inches tall, and 160 pounds at the time, opened his desk drawer to make sure his pistol was available. Kitchens had never met Desoto, who was five feet and seven inches tall and 280 pounds. Desoto entered IDB Racing's office and began talking with Kitchens. *Id.* The entire incident was recorded on IDB Racing's surveillance video, which did not record audio. *Id.*

According to Kitchens, Desoto was looking for a "long-haired hippy machinist" and became angry when Kitchens told him that no one fitting that description worked at IDB Racing. *Id.* Kitchens testified that Desoto became angry and agitated. *Id.* As Desoto was opening the door, apparently to leave, Kitchens testified that Desoto said, "[S]hit like this is why we will be back to beat your ass." *Id.* at *2. Kitchens testified that he reacted to Desoto's threat to "come back and beat [Kitchens's] ass" by responding back "the same thing he said, out of disbelief." *Id.* Kitchens said that Desoto then pulled the door closed, took the ear buds out of his ears, turned as if to enter back into the office, and "yelled that he was actually going to fuck me up right now." *Id.*

Desoto was unarmed during the entire incident, but because of his size and demeanor, Kitchens felt terror and believed he was about to be beaten to death by Desoto. *Id.* Kitchens drew his pistol from his desk drawer and shot Desoto, who fell to the floor. *Id.* As Kitchens walked forward to leave the office, Desoto started

to push himself up and looked at Kitchens. *Id.* Kitchens fired additional shots at Desoto, one of which struck Desoto just above the right eye. *Id.* Kitchens shot Desoto a total of five times. *Id.* Desoto died as the result of gunshot wounds to the head, chest, and back. *Id.*

The entire interaction between Kitchens and Desoto occurred over the course of approximately two minutes and was captured on the security video for IDB Racing. *Id.* The video showed both parties' movements as related by Kitchens, but it did not provide any sound. *Id.* Following the shooting, Kitchens called 9-1-1 to request police and an ambulance. *Id.* He then called Texas Law Shield, a program he had joined, to speak to an attorney. *Id.* Police responded, and Kitchens was eventually charged with murder. *Id.*

The jury in Kitchens's first trial was instructed in the charge on the law of self-defense and the use of deadly force, but it found Kitchens guilty of murder. *Id.* at *3. On appeal, this Court determined that the trial court erred in refusing Kitchens's request for a sudden-passion instruction and that some harm resulted from the error. *See id.* at *13–14. The Court observed that "[a] sudden-passion jury finding in the punishment phase reduces the first-degree felony offense of murder, [which carries a punishment range of five to ninety-nine years,] to a second-degree felony, which carries a punishment range of two to twenty years." *Id.* at *9 (citing TEX. PENAL CODE §§ 12.33(a), 19.02(d)).

4

We further observed:

A defendant is entitled to a sudden-passion jury instruction if the record "at least minimally" supports the following inferences:
1. that the defendant was acting under the immediate influence of passion, such as terror, anger, rage, or resentment;

2. that his sudden passion was in fact induced by some provocation by the deceased, which provocation would commonly produce such a passion in a person of ordinary temper;

3. that he committed the murder before regaining his capacity for cool reflection; and

4. that a causal connection existed "between the provocation, passion, and homicide."

*Id.* at *9–10 (citing *Wooten v. State*, 400 S.W.3d 601, 605 (Tex. Crim. App. 2013); *McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005)). Finally, we observed that "[a] defendant has the burden to prove the issue of sudden passion arising from an adequate cause at the punishment hearing by a preponderance of the evidence." *Id.* at *10 (citing TEX. PENAL CODE § 19.02(d)).

We concluded that Kitchens was entitled to the sudden-passion instruction and remanded the case for a new punishment hearing. *Id.* at *13–14.

In the punishment hearing on remand, the State reintroduced the evidence from the guilt-innocence trial that had been affirmed on appeal. It presented details about the offense itself, including identifying the complainant—Hipolito Thomas Desoto, known as "Tommy"—and presenting his autopsy report identifying him as a Hispanic man. The State further introduced the video from the day of the murder

5

showing the events from the time Desoto entered IDB Racing until after Kitchens shot him.

Kitchens relied primarily on his assertion that he shot Desoto under the influence of sudden passion, specifically that he was so filled with terror due to Desoto's appearance and mannerisms that he felt in fear of his life when he shot Desoto. Kitchens began setting out his defensive theory during voir dire, when his counsel asked questions supporting this strategy. Counsel asked the venire panel questions like, "[D]o you think someone's appearance can affect your impression of their intentions?" One of the potential jurors responded, "I have a problem with your statement. That's implicit bias, and I have an issue with that . . . [because] you're prejudging someone when you don't even know them." Defense counsel asked further, "But have you ever seen someone that you were afraid of by just their impression?" The venireperson responded, "Yeah, but it doesn't drive me to take their life." The defense also asked the venire panel about their feelings regarding motorcyclists, specifically asking, "When you hear the word 'bandito and motorcycles' what do you think about?" Venire members answered, "cartel," "gang member," and "stereotype."

During opening statements, defense counsel again advanced Kitchens's defensive theory by describing what the evidence would show regarding Desoto's appearance, stating that Kitchens and his employees "saw a big man, riding a

6

motorcycle, wearing sunglasses and no helmet." Defense counsel informed the jury that Kitchens would testify that he had never seen Desoto before and had no idea who he was, and he "didn't look like one of [Kitchens's] normal customers." He pointed out the difference in size between Kitchens and Desoto, who weighed over 100 pounds more than Kitchens.

As the State presented its case, Kitchens's counsel elicited testimony from a law enforcement officer who testified that Desoto rode his motorcycle with his hands "up high" on the motorcycle's handlebars and that he was wearing sunglasses at the time he rode up to Kitchens's business. At defense counsel's prompting, another State's witness testified that Desoto was dressed "like a mechanic" and "wasn't dressed . . . like he owned a Jaguar or Lamborghini or high-end Mercedes." The witness also described Desoto as "substantially bigger" than Kitchens. In other portions of his cross-examination, Kitchens's counsel described Desoto as a "big, menacing man riding a motorcycle"

Kitchens's expert, clinical and forensic psychologist Dr. Gerald Harris, testified about the fight-or-flight response when someone perceives a threat. He testified that fear or a perceived threat triggers the brain to react strongly in a way that the person's "ability to control their behavior in that short period of time" is reduced. When asked whether the threat has to be "real or perceived" to trigger the fight-or-flight response, Dr. Harris testified that "it doesn't matter" and that the

"reaction can be set off by the perception," including "phobias." He testified, "Some people, when they see a spider or a dog, they go berserk immediately. The spider is really not a threat to them, but that's what they perceive." Defense counsel asked whether "[s]omeone riding a motorcycle with high handlebars, wearing dark sunglass—big and wearing a dark shirt and comes into a business who you've never seen before, would that description of someone be—could someone perceive that as being a concerning feature?" Dr. Harris agreed that being confronted by someone like that "could be perceived as a potential threat," stating, "Well, yeah, in this culture, that would be concerning to most people, I would think. Yeah." He further testified that "the physical size of a person does affect the perception of a threat or strength."

Kitchens's employees also testified on his behalf. Chad Finch testified that he met Kitchens through a shared interest in motorcycles. They used to ride and race motorcycles together. He eventually began working for Kitchens at IDB Racing, working in various capacities over several years. Finch testified regarding Desoto's appearance at the shop on the day of the shooting. He stated that it was "very odd" seeing "a big, burly guy on a Harley," which was "not a thing you normally see pulling up to our shop." He testified that the shop worked on high-end cars rather than motorcycles, and customers generally appeared by appointment only. He further testified that Desoto looked "a little rough" was "just

not our normal clientele." Jonathan Bell testified that Desoto was "an unexpected visitor with a frightening appearance" who "[j]ust looked scary and angry and didn't look like the typical person we deal with."

Kitchens testified regarding his thoughts and actions at the time of the shooting. He testified that the shop was in "not a very nice" neighborhood because he could not afford to rent space in a better location. He testified that there were several bullet holes in one of the garage bay doors and that he felt it was necessary to put security cameras around his shop. When he saw Desoto drive by on his motorcycle, his first reaction to seeing "a big, burly biker without a helmet that [he] didn't recognize" was to be "a little uneasy." He testified that he opened the desk drawer where he kept his firearm to check that it was there before Desoto walked into the shop. Kitchens described the way Desoto appeared to him at the time, stating, "From where I was sitting down, it looked like he was at least two to three times bigger than me."

Kitchens testified that the first thing Desoto asked upon coming into the shop was "where the long-haired-hippy machinist is." Kitchens told Desoto that he did not know anything about a machinist and asked if he might be at one of the other nearby businesses. Kitchens knew of a man who had long hair and worked at a machine shop across from IDB Racing, but he did not share this information with Desoto. Kitchens described Desoto's tone of voice as "angry and irritable when he

9

first came in." Kitchens stated that Desoto again demanded to know the location of the "long-haired hippy," and Kitchens "was becoming scared." He testified, "There was a big, angry guy. He was looking for somebody. I didn't know who he was talking about. And his immediate reaction was to tell me that I didn't fucking get it. That's not how I've ever talked to somebody when I went looking for a person."

Kitchens testified that Desoto got "more angry and more animated," and his tone of voice got "louder and angrier progressively." Kitchen repeated to Desoto that he did not know who Desoto was looking for and asked him to leave. Kitchens testified that Desoto then said, "Shit like this is why they were going to come back, and they were going to beat [Kitchens's] ass." Kitchens testified that, after hearing that, he "was terrified" and "had visions in [his] head of 20 bikers rolling up with shotguns and clubs." Kitchens testified that he initially felt relief when he thought Desoto was leaving; however, Desoto pushed the door open and then stopped, telling Kitchens, "Actually, I'm going to fuck you up right now." At that point, Kitchens "thought [Desoto] was about to beat me to death," so he pulled out his pistol and shot him. He testified that he thought Desoto was "getting back up off the ground" to beat him, and he "didn't understand" how Desoto "didn't stop," so he shot him again. Describing the two-and-a-half-minute encounter, Kitchens testified that his feelings "went from being curious to uneasy, to scared, to

10

terrified, to thinking I was about to die. I wouldn't have shot him, otherwise. I thought he was going to kill me. I didn't understand."

During closing arguments, the State argued that sudden passion did not apply, in part, because there was no evidence that Desoto provoked Kitchens. The State pointed to evidence that Desoto entered an open business during daylight hours. Despite the fact that he rode a Harley-Davidson motorcycle and was "not a small guy," he was unarmed and did not engage in any overtly threatening acts when he entered the business, interacted with Kitchens, and turned to leave. Without objection, the State argued, "Any predispositions of the defendant, any biases that the defendant has are not [Desoto's] fault. Remember provocation has to be directly caused by [Desoto]."

Defense counsel, during closing arguments, again emphasized Desoto's appearance, pointing out that he was a "biker" who weighed 280 pounds who "disrupted" Kitchens's business. The defense further described Desoto as "menacing," arguing that his appearance and words were enough to "terrorize an ordinary person" like Kitchens. The defense further referred to Desoto as an "outlaw biker," stating that he "wasn't where he was supposed to be."

In its closing rebuttal, the State made the following comments:

Now, [Kitchens] taught you a lot about sudden passion. So I'm not going to belabor and waste your time going back through the points [Kitchens] already made.

11

I do want to talk to you about something that, for whatever reason, we haven't talked about. And in the five-and-a-half years since this happened, we've used code words to signify it. But no one has actually explicitly said it. Let's talk about the code words they used: "He's overweight."

He's 280 pounds.

"He was a biker."

And he suddenly turned into an "outlaw biker," during closing arguments.

That he rode a "Harley Davidson motorcycle with his handle bars that were up here."

That he had "facial hair."

That he was "scary."

They're all just saying he was scary because of what? He was scary because he was a Hispanic guy. That's what they're not saying.

The defense objected "to any race injected into this trial," and the trial court asked the parties to approach to discuss the objection. At the bench, the defense clarified that it was making a legal objection "of race," stating that "[i]t violates the Fourteenth Amendment for any purpose under the United State. And *Buxton v. Collins*, specifically chastises the State of Texas for the injection of race." Defense counsel further stated that the suggestion that Kitchens shot Desoto "because of race is offensive and repulsive" and "violates the Eighth Amendment and the Fifth Amendment." The State responded that Desoto's race was "something that we can see on the video. It's seen in the pictures that he's Hispanic." The State also argued:

I don't think it's a negative inference. But it's the fact that he's Hispanic and that could have played a part in whatever alleged fear and the provocations that occurred in this case based on the defendant.

12

I'm not commenting on the defendant's race; I'm commenting on the race of the complainant.

The defense argued that it was not permissible to suggest that Desoto "was shot because he was a large Hispanic man" because "this isn't a racial shooting" and "there's no evidence at all." The trial court observed that a lot of evidence was introduced regarding Desoto's appearance throughout the trial and asked the State whether it was commenting on Desoto's appearance. The State responded, "Yes. He was Hispanic, Judge." The trial court then overruled the defense's objection, and the State continued its closing argument to the jury:

> [State]: The complainant was Hispanic. It's not a shock to anyone, right? You can see it in his picture. Why do you think they keep calling him "Hipolito Desoto?" It's "Tommy Desoto." The defendant's own prejudices—
>
> [defense]: Your Honor, I object. There's been no evidence of any prejudice by Mr. Kitchens.
>
> [Court]: Overruled.
>
> [State]: Don't let the defendant's own prejudices become your own.

The jury determined that Kitchens did not prove that he acted under the influence of sudden passion. It assessed his punishment at 25 years' confinement. This appeal followed.

## Closing Argument

In his first issue, Kitchens argues that the trial court erred "in failing to sustain [his] several objections to the injection of race into the trial" during closing

13

argument. In his second issue, he argues that the State engaged in prosecutorial misconduct and violated his due process rights when it commented on Desoto's race during closing argument.

## A.    Standard of Review

We review a trial court's rulings on objections during closing argument for an abuse of discretion. *Milton v. State*, 572 S.W.3d 234, 240 (Tex. Crim. App. 2019).

"The purpose of closing argument is to facilitate the jury in properly analyzing the evidence presented at trial so that it may 'arrive at a just and reasonable conclusion based on the evidence alone, and not on any fact not admitted in evidence.'" *Id.* at 239 (quoting *Campbell v. State*, 610 S.W.2d 754, 756 (Tex. Crim. App. 1980)). Proper closing argument "should not 'arouse the passion or prejudice of the jury by matters not properly before them.'" *Id.* Thus, proper closing argument generally falls within one of four areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to an argument of opposing counsel, and (4) plea for law enforcement. *Id.* We consider a challenge to the State's closing argument in the context of the entire record, including the complete arguments of both parties, to determine whether the contested statements fall within the scope of these four categories. *Klock v. State*, 177 S.W.3d 53, 64

(Tex. App.—Houston [1st Dist.] 2005, pet. ref'd); *see Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988).

A prosecuting attorney is permitted wide latitude in argument to draw all inferences from the facts in evidence which are reasonable, fair, and legitimate, and offered in good faith. *Mims v. State*, 434 S.W.3d 265, 275 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *see Brown v. State*, 270 S.W.3d 564, 572 (Tex. Crim. App. 2008) (citing *Gaddis*, 753 S.W.2d at 398); *Cantu v. State*, 939 S.W.2d 627, 633 (Tex. Crim. App. 1997).

## B.    Improper Jury Argument

Kitchens complains that the trial court erred in overruling his objections to the State's closing argument, during which the prosecutor restated the evidence providing details of Desoto's appearance and said, "They're all just saying he was scary because of what? He was scary because he was a Hispanic guy. That's what they're not saying." Kitchens further objects to the prosecutor's subsequent reference to Desoto's identity as a Hispanic man and the appeal not to let "the defendant's own prejudices become your own."[1]

---

[1]    The State argues that Kitchens failed to preserve his complaint to the prosecutor's statement not to "let the defendant's own prejudices become your own" because he failed to object again. However, the record reflects that after the State began the statement—"The defendant's own prejudices"—the defense then objected to the reference to Kitchens's prejudice, and the trial court overruled the objection, allowing the State to make the statement Kitchens now complains of on appeal— "Don't let the defendant's own prejudices become your own." We conclude that this was sufficient to preserve Kitchens's complaint regarding this closing

The State, however, contends that the arguments were proper. The State points out that Desoto's race was a fact in evidence. It also pointed out that the testimony of Kitchens and other witnesses regarding Desoto's appearance and mannerisms—given to support Kitchens's sudden-passion issue—demonstrated "that the complainant's appearance played a role in [Kitchens's] decision to murder the complainant." The State thus asserts that the prosecutor's statements during closing argument made reasonable inferences from Kitchens's own testimony. The State argues that, because Kitchens put his perceptions of Desoto at issue by asserting that he acted under the influence of sudden passion, the prosecutor was responding to an argument of opposing counsel in pointing out that the part of Desoto's appearance that provoked terror in Kitchens's mind was Desoto's identity as a Hispanic man. We agree with the State.

Kitchens essentially argues that the State left the jury with the impression that Kitchens's shooting of Desoto was racially motivated, rather than being motived by Kitchens's terror based on Desoto's threats. This mischaracterizes both the evidence and the State's closing arguments. The evidence presented at trial demonstrated that Kitchens had never met or seen Desoto prior to the shooting. Thus, Kitchens's impressions about the level of danger Desoto posed were based

argument. *See Hernandez v. State*, 538 S.W.3d 619, 622 (Tex. Crim. App. 2018) (holding that "[e]rroneous jury argument must be preserved by objection pursued to an adverse ruling").

16

on his observations of Desoto's appearance and actions during the approximately two-and-a-half minutes between when Desoto entered Kitchens's shop and when Kitchens shot him. Desoto was unarmed when he entered IDB Racing during business hours. Kitchens and other witnesses testified that Desoto rode to the store on a motorcycle that had high handlebars. Kitchens himself also rode motorcycles, but he testified that his business focused on restoring high-end cars. The video showed that Kitchens and Desoto were dressed similarly, in tennis shoes and dark shorts. Desoto had sunglasses pushed up onto his forehead. Desoto was approximately the same height as Kitchens, but Desoto weighed significantly more.

In addition to describing these facts about Desoto, Kitchens and his employees testified that Desoto was dressed "like a mechanic" rather than being dressed "like he owned a Jaguar or Lamborghini or high-end Mercedes" and that it was "very odd" seeing "a big, burly guy on a Harley," which was "not a thing you normally see pulling up to [Kitchens's] shop." Another witness testified that Desoto looked "a little rough" and was "just not [Kitchens's] normal clientele," and described Desoto as "an unexpected visitor with a frightening appearance" who "[j]ust looked scary and angry and didn't look like the typical person we deal with."

In his own testimony, Kitchens testified that Desoto's appearance made him "a little uneasy." Kitchens described Desoto as "angry" and "animated." During closing arguments, defense counsel again emphasized Desoto's appearance, pointing out that he was a "biker" who weighed 280 pounds and who "disrupted" Kitchens's business. The defense further described Desoto as "menacing," arguing that his appearance and words were enough to "terrorize an ordinary person" like Kitchens. The defense referred to Desoto as an "outlaw biker," stating that he "wasn't where he was supposed to be." Defense counsel argued that Desoto's appearance and threats so terrified Kitchens that he acted in sudden passion when he shot Desoto repeatedly. Thus, Kitchens's own evidence and defensive theory put his impressions of Desoto at the center of the punishment hearing.

Kitchens acknowledges that Desoto's race was a matter already in evidence. It was apparent in the video and included in the autopsy report. He argues, however, that "nothing in the record suggests nor supports the assertion by State's counsel that [Kitchens] harbored any racial prejudice towards the deceased or acted because the deceased was [a] Hispanic man." But the crux of Kitchens's defense was that he judged the degree of danger that Desoto posed based on Desoto's appearance as a large biker who rode up to the business on a Harley and based on Desoto's angry and threatening manner when Kitchens could not help him find the machinist. Kitchens argued that he was so terrified by Desoto's appearance and

threats to beat him that he acted under sudden passion when he fired his weapon. Desoto's race was an obvious part of his appearance, as was the fact that Desoto rode a motorcycle and was more than 100 pounds heavier than Kitchens. The State did not belabor the references to Desoto's race, mentioning it just twice in its closing argument, in addition to repeating multiple aspects of Kitchens's evidence regarding Desoto's appearance. The State's argument that Kitchens acted based on a bias or prejudice formed during his limited interaction with Desoto is a reasonable inference from that evidence. *See Milton*, 572 S.W.3d at 239 (holding that proper argument includes reasonable deductions from evidence); *Klock*, 177 S.W.3d at 64 (holding that courts determine whether contested statement falls within proper scope of closing argument in context of entire record, including complete arguments of both parties). This includes the State's argument that one aspect of Desoto's appearance—his identity as a Hispanic man—played a role in Kitchens's judgment that Desoto was, as defense counsel argued, a "menacing," "outlaw biker" who "disrupted" business by not being "where he was supposed to be." Defense counsel contrasted this description of Desoto by describing Kitchens as an "ordinary" person who was terrified by Desoto's appearance and threats.

Kitchens cites numerous cases to "demonstrate[] the nation's abhorrence of the injection of race into court proceedings" and to demonstrate that the State's reference to Desoto's race and its implication that Kitchens's own prejudice played

19

a role in the shooting violated his due process and equal protection rights under the Fourteenth Amendment. The cases relied upon by Kitchens are materially distinguishable, primarily because none of the cases cited by Kitchens involved a situation, as here, where the issue of race arose in response to the defendant's own testimony and defensive theory. For example, Kitchens cites *United States v. Grey* for the propositions that "[a]ppeals to racial prejudice are foul blows and the courts of this country reject them" and that when "such prejudicial tactics may have had a substantial influence upon the result of a trial, reversal for new trial is ordered." 422 F.2d 1043, 1046 (6th Cir. 1970).

The racial prejudice in *Grey* involved a question asked by the prosecutor while cross-examining one of defendant Grey's character witnesses: the prosecutor asked whether the witness "knew that Grey, a Negro, and a married man was 'running around with a white go-go dancer.'" *Id*. at 1044–45. The court noted that it found the evidence less-than-adequate to support the jury's finding of guilt against Grey and observed that, because of the lack of direct support, "the claim of deliberate injection of race prejudice into the United States Attorney's cross-examination of one of Grey's character witnesses takes on greater significance." *Id*. at 1045. The court found "no nonprejudicial explanation for the 'white go-go dancer' question," noting that "[a]t best, the entire question" was irrelevant because no witness had put the defendant's marital fidelity at issue, and "[a]t

20

worst, the gratuitous reference to the race of the go-go dancer may be read as a deliberate attempt to employ racial prejudice to strengthen" the government's case. *Id.*

Here, in contrast to *Grey*, Kitchens had already been convicted of murder, and the evidence supporting the jury's finding against sudden passion during the sentencing phase was based on significant evidence, including review of video footage of the shooting and the testimony of numerous witnesses, including Kitchens himself. The complained-of statements were made during closing argument, rather than seeking admission of potentially racially-biased evidence. As already discussed, there was a nonprejudicial explanation for the State's reference to the race of the complainant. Kitchens's own strategy—starting with defense counsel's "bandito" question during voir dire and continuing through the rest of the case—placed Kitchens's personal feelings about and reactions to Desoto's appearance and mannerisms at the center of the trial. Thus, the State's comment during closing argument was not "gratuitous" as was the question in *Grey*, but was instead relevant to addressing Kitchens's own defensive issue.

Likewise, *McCleskey v. Kemp*, is materially different. *See* 481 U.S. 279, 309 n.30 (1987) (recognizing that U.S. Constitution prohibits racially-biased prosecutorial arguments and that prosecutorial discretion cannot be exercised on basis of race). In *McCleskey*, the Supreme Court considered whether it was

21

appropriate to use a statistical analysis of more than 2,000 murder convictions in Georgia in addressing a complaint that Georgia's capital-sentencing process was administered in a racially discriminatory manner. *Id.* at 286. The Supreme Court ruled that the study, which concluded that the State of Georgia imposed the death penalty more often on black defendants and killers of white victims than on white defendants and killers of black victims, failed to demonstrate that any party in defendant's case acted with discriminatory purpose. *Id.* at 298–99. It further concluded that the study did not establish a violation of the defendant's Eighth Amendment rights. *Id.* at 312–13 (holding that, "[a]t most, the Baldus study indicates a discrepancy that appears to correlate with race," and that "the Baldus study does not demonstrate a constitutionally significant risk of racial bias affecting the Georgia capital sentencing process"). Here, rather than research regarding racial bias generally, the State's closing argument addressed the specific facts of the case and drew inferences from those facts in order to respond to the defensive issue of sudden passion.

In *Buck v. Davis*, Buck's own counsel called an expert to the stand knowing that the expert viewed "Buck's race [as] competent evidence of an increased probability of future violence." 580 U.S. 100, 107 (2017). The expert testified regarding "statistical factors" that were "know[n] to predict future dangerousness," identifying race as one of those factors. *Id.* (also observing that expert's report

22

stated that defendant's identity as black man led to "[i]ncreased probability" of future dangerousness, stating, "There is an over-representation of Blacks among the violent offenders"; and pointing to expert's testimony that "[i]t's a sad commentary . . . that minorities, Hispanics and black people, are over-represented in the Criminal Justice System"). The Supreme Court held that, under the circumstances of that case, the trial court abused its discretion in denying Buck's motion to reopen a judgment on grounds that included "the risk of injustice to the parties" and "the risk of undermining the public's confidence in the judicial process." *Id.* at 123. The Supreme Court determined that Buck's counsel's ineffective assistance in admitting the expert report "makes clear that Buck may have been sentenced to death in part because of his race," noting that such a result "is a disturbing departure from a basic premise of our criminal justice system: Our law punishes people for what they do, not who they are." *Id.* at 123–24.

Here, by contrast, the reference to the race of the complainant, Desoto, was materially different. The State looked to what Kitchens himself actually said and did in making its inference that Kitchens's perception of the threat Desoto posed was informed, at least in part, by the fact that Desoto was a large Hispanic male. Thus, unlike the expert report admitted into evidence in *Buck*, the State's closing argument here did not pose a risk of encouraging the jury to punish Kitchens for who he is, rather than what he did. *See id.*; *see also, e.g.*, *U.S. v. Vue*, 13 F.3d 1206,

23

1212–13 (8th Cir. 1994) (witness testified about connection between opium trade and people of Hmong descent, stating that "95 percent" of opium smuggling cases in area "related to Hmong individuals"; court held that admission of evidence tying ethnicity of defendant to "the ethnic characteristics of drug dealers in a specific geographic area or a specific type of drug trade" is "highly improper").[2]

Here, the trial court could have concluded that the State was responding to Kitchens's own defensive argument when the prosecutor suggested that Kitchens's bias or prejudice—whether based on Desoto's identity as a Hispanic man, a biker, an overweight man, or some other obvious characteristic identified in the evidence—influenced his state of mind and his perception that he was in serious danger from Desoto. Thus, the State's argument drew a reasonable inference from Kitchens's own testimony about Desoto's appearance, and the argument was also a reasonable response to Kitchens's defensive issue that he acted under the influence of sudden passion. *See Milton*, 572 S.W.3d at 239 (holding that proper argument includes answers to argument of opposing counsel); *Garcia v. State*, 126 S.W.3d

---

[2]     Kitchens's case is more like *Alonzo v. John*, which is a civil case but places the issue of race in a context more similar to this case. 647 S.W.3d 764, 785 (Tex. App.—Houston [14th Dist.] 2022, pet. filed). The *Alonzo* court viewed the reference to the plaintiff's gender and race "in the context of the discussion during voir dire about juries awarding smaller damage awards to women," and it "agree[d] with appellees that their argument was not a suggestion that appellants were racist or sexist, but a request of the jurors to not let implicit racial or gender bias impact their deliberations. It was not an 'appeal to racial prejudice in language clear and strong,' but rather an appeal to impartiality." *Id.*

24

921, 925 (Tex. Crim. App. 2004) (holding that arguments directed at defense counsel's arguments and theories in case are not improper).

Given Kitchens's own emphasis on Desoto's appearance and mannerisms, the trial court could have concluded that the evidence supported the State's inference that Desoto's race was a factor in the effect his appearance had on Kitchens. Given the entire context of the hearing and the closing arguments, the State's argument did not seem likely to "arouse the passion or prejudice of the jury by matters not properly before them." *See Milton*, 572 S.W.3d at 239. Rather, the State's argument here falls within the wide latitude afforded a prosecuting attorney to draw all inferences from the facts that Kitchens himself put into evidence and made relevant to his sudden-passion issue. *See Mims*, 434 S.W.3d at 275 (attorney can draw inferences which are reasonable, fair, and legitimate, and offered in good faith).

We conclude that the trial court did not abuse its discretion in overruling Kitchens's objections to the State's closing argument. *See Milton*, 572 S.W.3d at 240.

We overrule Kitchens's first issue.

## C.      Prosecutorial Misconduct

In his second issue, Kitchens argues that these same comments constituted prosecutorial misconduct.

25

To preserve error in cases involving prosecutorial misconduct, the appellant must have (1) made a timely and specific objection; (2) requested an instruction that the jury disregard the matter improperly placed before the jury; and (3) moved for a mistrial. *Jimenez v. State*, 240 S.W.3d 384, 402 (Tex. App.—Austin 2007, pet. ref'd). However, in cases where the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process," error preservation is not required. *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). The prosecutorial misconduct must have denied the defendant a fair trial. *Id.* "It is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Id.* (quoting *Darden*, 477 U.S. at 181).

Here, Kitchens did not object on the basis of prosecutorial misconduct. Thus, we can only consider whether any misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See id.* As stated above, however, we concluded that the State's closing argument was not improper. The prosecutor did not engage in misconduct in making proper jury argument, and nothing in the record indicated that the prosecutor made a willful or calculated effort to deprive Kitchens of a fair trial. *See, e.g.*, *Cantu*, 939 S.W.2d at 633 (holding that argument is extreme or manifestly improper if there was willful and calculated effort on prosecutor's part to deprive appellant of fair and impartial trial).

We overrule Kitchens's second issue.

## New Trial Hearing

In his third issue, Kitchens argues that the trial court erred by "failing to afford [him] a hearing on his new trial motion." The trial court sentenced Kitchens in open court on December 20, 2021. He filed his motion for new trial on January 12, 2022, and that motion did not request a hearing. Kitchens filed his amended motion for new trial on January 18, 2022, requesting a hearing for the first time. On February 11, 2022, Kitchens filed a motion requesting a hearing.[3] The record contains a form titled, "Acknowledgment of Presentment of Defendant's Motion for New Trial and Order Setting Hearing Date," but the form is blank and unsigned. The record shows that these motions were served on the State. The docket sheet reflects only that the motions for rehearing and motion requesting a hearing were filed.

### A. Relevant Law

Although a criminal defendant has a right to move for a new trial, *see* TEX. R. APP. P. 21, he does not have an "absolute right" to a hearing on his motion for new trial, *Hobbs v. State*, 298 S.W.3d 193, 199 (Tex. Crim. App. 2009). We review the denial of a hearing on a motion for new trial for an abuse of discretion

---

[3] The motion requesting a hearing was titled, "Motion Requesting a Hearing on Motion for New Trial Finding of Guilt," but the substance of the motion requested a hearing on the motion for new trial filed after the punishment hearing on remand.

27

and will reverse only if the trial court's ruling falls outside the zone of reasonable disagreement. *Smith v. State*, 286 S.W.3d 333, 339 (Tex. Crim. App. 2009). The failure to hear the motion constitutes an abuse of discretion only if the motion and accompanying affidavits (1) raise matters that are not determinable from the record and (2) establish reasonable grounds showing that the defendant could potentially be entitled to relief. *Id.* at 338–39.

The issue is preserved by a timely filed and presented motion for new trial that requests a hearing. *See Rozell v. State*, 176 S.W.3d 228, 230–31 (Tex. Crim. App. 2005) (holding that issue of trial court's failure to hold hearing on motion for new trial not preserved where motion for new trial did not request hearing; also holding that "[p]resenting the motion, along with a request for a hearing, is required to let the court know that the defendant wants the trial court to act on the motion and whether the defendant would like a hearing on the motion").

A motion for new trial must be presented to the trial court within 10 days of its filing. TEX. R. APP. P. 21.6; *Obella v. State*, 532 S.W.3d 405, 407 (Tex. Crim. App. 2017). "This means the defendant must give the trial court actual notice that he timely filed a motion for new trial and requests a hearing." *Obella*, 532 S.W.3d at 407 ("A reviewing court does not reach the question of whether a trial court abused its discretion in failing to hold a hearing if no request for a hearing was presented to it.") (quoting *Rozell*, 176 S.W.3d at 230).

**B.    Analysis**

Here, nothing in the record indicates that Kitchens gave the trial court actual notice of his motion, his amended motion, or his request for a hearing. The record contains no notice of hearing, docket sheet entry setting a hearing date, order resetting or denying the motion, "or other proof that the trial court was actually aware of" Kitchens's request for a hearing on his motion for new trial. *See Harris v. State*, 668 S.W.3d 83, 92 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd) (quoting *Arrellano v. State*, 555 S.W.3d 647, 655 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd)). The record contains a file-stamped copy of Kitchens's motions and certificates indicating service of the motions to the State. Thus, the record shows only that Kitchens's motion was timely filed, which is insufficient to show that the motion, including the request for a hearing, was timely presented. *See id.*; *Stokes v. State*, 277 S.W.3d 20, 21 (Tex. Crim. App. 2009) ("Merely filing the motion is not sufficient alone to show presentment."); *Arrellano*, 555 S.W.3d at 655 ("Presentment requires the defendant to go beyond simply filing the motion for new trial with the trial court clerk.").

Accordingly, Kitchens's complaint that the trial court erred in failing to hold a hearing on his motion for new trial was not preserved. *See Rozell*, 176 S.W.3d at 230–31.

We overrule Kitchens's third issue.

## Conclusion

We affirm the judgment of the trial court.

Richard Hightower
Justice

Panel consists of Justices Kelly, Hightower, and Countiss.

Do not publish. TEX. R. APP. P. 47.2(b).